KNOLL, Judge.
Clarence E. Coody and his wife, Alice, appeal a unanimous jury verdict which rejected their medical malpractice claim against Dr. William P. Richardson, individually and as a medical corporation, and St. Paul Fire and Marine Insurance Company (hereafter St. Paul Insurance), Dr. Richardson’s malpractice insurer, for injury to Mr. Coody during back surgery which allegedly rendered him impotent.
The Coodys contend that: (1) the jury’s verdict was contrary to the law and evidence; (2) the trial court erred in failing to charge the jury on “res ipsa loquitur” and the significance of incomplete records of treatment; (3) the trial court erred in failing to grant their motion for mistrial during the course of trial; and, (4) the trial court erred in- failing to grant their post-trial motion for judgment notwithstanding the verdict and/or new trial. We affirm.
FACTS
On September 19, 1983, Dr. Clark A. Gunderson, an orthopedic surgeon, assisted by Dr. William P. Richardson, a general and peripheral vascular surgeon, performed an anterior lumbar interbody fusion (which means the surgical approach to the lumbar vertebrae is through the abdomen instead of the back) on Clarence Coody at Lake Charles Memorial Hospital. The anterior approach was required because of the reabsorption of a prior fusion which had been performed posteriorly at this same level.[1] Dr. Richardson prepared the anterior approach to the spine through the abdomen, and Dr. Gunderson performed the fusion at the L4-5 level of Coody’s spine.
Three months after the surgery, Coody’s wife told Dr. Gunderson that although Mr. Coody was capable of sexual intercourse prior to the anterior lumbar fusion, post-op-eratively he was impotent. Dr. Gunderson immediately referred Mr. Coody to Dr. Reed Fontenot, a urologist, for an evaluation for impoteney. Despite Dr. Gunder-son’s referral of Mr. Coody to Dr. Fontenot in December 1983, Mr. Coody did not consult Dr. Fontenot until August 1984. Subsequent to Dr. Fontenot’s preliminary tests which confirmed Mr. Coody’s impoteney, various urologists and specialists in the field of sexual dysfunction, whose testimonies will be detailed hereafter, examined Coody and reaffirmed that he was impotent.
Ultimately, Coody and his wife, Alice, sued only Dr. Richardson, contending that his part of the operation caused Coody’s impoteney. After five days of testimony, a *1014 unanimous jury returned a verdict in favor of Dr. Richardson and his insurer and against the Coodys, finding no negligence on Dr. Richardson’s part. Subsequently, the Coodys’ motions for judgment notwithstanding the verdict and/or a new trial were denied and this appeal ensued.
JURY’S VERDICT WAS CONTRARY TO THE LAW AND EVIDENCE
The Coodys contend that the jury erred in rejecting their claim against Dr. Richardson, because Mr. Coody was not informed that impotency was a complication of surgery, and the only reasonable hypothesis for Mr. Coody’s impotency was that Dr. Richardson injured the parasympathetic nerves during surgery. In making this argument, the Coodys admit that they were unable to produce any direct evidence to show the cause of the injury and that their circumstantial evidence suggested that damage to the parasympathetic nerves during the operation was the most plausible explanation of Mr. Coody’s injury.
LSA-R.S. 9:2794(A) sets out the test for meeting the burden of proof in medical malpractice actions. It provides, in pertinent part:
“In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq. ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3)That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.”
Injury alone does not raise a presumption of the physician’s negligence. LSA-R.S. 9:2794(C). The respective weight to accord expert testimony, and the factual conclusions regarding negligence to be drawn therefrom, are functions of the trier of fact. Absent a showing of manifest error, these conclusions may not be reversed on appeal. Malbrough v. Hamsa, 463 So.2d 639 (La.App. 5th Cir.1984), writs denied, 466 So.2d 472, 474 (La.1985).
Basic to an analysis of the jury’s ultimate disposition of the Coodys’ contention is an understanding of the male physiology. Accordingly, as an aid to better understanding the questions presented in the malpractice case sub judice, we have appended an anatomical drawing to this opinion which was introduced into evidence. (See Appendix A.)
With reference to Mr. Coody’s impotence, the trier of fact heard the expert medical testimony of six doctors, all of whom agreed on the following primary facts: (1) male sexual function is controlled by the sympathetic and parasympathetic nerves which exit the spinal cord; (2) the sympathetic nerves exit the spinal cord between the ninth thoracic vertebra and the second lumbar vertebra and affect detumescence, e.g., loss of erection; (3) an injury to the sympathetic nerves would cause retrograde ejaculation, i.e., the ejection of semen into the bladder rather than through the penis; (4)the pelvic brim is located at the level of the first sacral vertebra; (5) the parasympathetic nerves exit the spinal cord between the second and fourth sacral vertebrae, below the pelvic brim, and control the urinary bladder, the prostate, and the erectile function of the penis; (6) injury to the parasympathetic nerves may cause an inability to achieve an erection; and, (7) the anterior lumbar interbody fusion which was performed on Mr. Coody was done at the L4-5 level, above the pelvic brim.
*1015 The first issue presented to the jury was whether Mr. Coody was informed that impotency was a complication of the anteri- or lumbar interbody fusion.
Credibility was directly addressed in the resolution of this issue: the Coodys contended that Dr. Gunderson did not make Mr. Coody aware that impotence was a complication of surgery, and that Dr. Richardson never discussed the surgery with him prior to his entering the operating room.
Dr. Gunderson testified that the anterior fusion was planned well in advance of surgery, and that he discussed sexual dysfunction, i.e., sterility in terms of retrograde ejaculation, as a possible complication of surgery in his office on the Friday prior to surgery and again on the Sunday night before surgery. He further testified that he also usually addresses impotency as a complication of surgery of this type because of the residual pain associated with the anterior approach.
In addition to Dr. Gunderson’s testimony, Dr. Richardson presented the testimony of Dr. Gunderson’s physician assistant, Ken Palmer. Palmer testified that he was present with the Coodys in Dr. Gunder-son’s office on Friday, September 16, the day Mr. Coody was admitted into the hospital for the anterior fusion, and that he positively heard the discussion of risks and complications. Palmer testified that Dr. Gunderson specifically enumerated impotency as a risk of surgery. The Coodys denied that Palmer was present for this discussion in Dr. Gunderson’s office.
Dr. Richardson testified that he had a pre-operative discussion with Mr. Coody on the Sunday night prior to surgery, and that he discussed impotency as a complication. Although Dr. Richardson candidly admitted that he did not have a detailed recollection of all he discussed, he stated that he always conducts pre-operative discussions even when he is not the primary surgeon, and that he has never deviated from this practice. Dr. Gunderson corroborated Dr. Richardson’s testimony, stating that he and Dr. Richardson performed numerous surgeries together, and that he knew Dr. Richardson customarily conducted a consent and complications discussion with the patient, even when Dr. Richardson was not the primary surgeon.
Credibility determinations and the resolution of opposing factual presentations are questions for the trier of fact. An appellate court will not disturb the trier of fact’s determination unless it is manifestly erroneous. West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979). After carefully reviewing the record on the question of Mr. Coody’s informed consent, we cannot say that the jury’s determination of this issue in favor of Dr. Richardson is manifestly erroneous.
However, before we leave this aspect of the opinion, it is necessary for us to address the Coodys’ contention that the trial court erred in not instructing the jury that it could consider incomplete medical records in its assessment of whether Dr. Richardson adhered to the prescribed rules of his profession.
In the case sub judice, there was testimony that Dr. Richardson’s consult with Mr. Coody was undated in the hospital’s medical records, and only the word “Done” appeared on the consultation note. During the course of trial, the Coodys extracted testimony that Dr. Richardson’s consult note was an incomplete record. Thus, they proffered a jury instruction on this issue.
The standard of appellate review is that the mere discovery of an error in the trial judge’s instruction does not itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case. Simmons v. Hope Contractors, Inc., 517 So.2d 333 (La.App. 1st Cir.1987), writ denied, 518 So.2d 510 (La.1988). If our examination reveals the jury charges were either so incorrect or inadequate as to preclude the jury reaching a verdict in accordance with the law and facts, we must render a judgment on the record as if we had the case before us for a trial de novo. Id. 337.
*1016 Assuming for purposes of argument that the trial court should have given the instruction tendered by the Coodys, we do not find that the instructions as a whole were so incorrect or inadequate as to preclude the jury reaching a verdict in accordance with the law and facts. Initially, we find that the Coodys presented no evidence that it was Dr. Richardson’s duty to independently conduct a consent consultation since he was not the primary, admitting surgeon. Moreover, the trial court more than adequately addressed the jury on the determination of credibility and its duty to weigh the oral testimony and documentary evidence. Furthermore, in light of Mr. Coody’s signed consent on September 18, 1983, the night before surgery, and the cumulative evidence of other conferences by Dr. Gunderson on the risks and complications of surgery, we cannot say that the failure to give the requested jury instruction constitutes reversible error.
The Coodys next contend that Mr. Coody was rendered impotent as a result of the operation, and that impotency was a complication that arises from an anterior lumbar interbody fusion when the parasympathetic nerves are involved if dissection is carried below the pelvic brim. Thus, they argue that the jury manifestly erred in not finding Dr. Richardson negligent.
In making this argument the Coodys assert that Dr. Richardson, rather than Dr. Gunderson, was the surgeon who was closest to the parasympathetic nerves, and in all probability his actions during surgery damaged the nerves.
The testimonies of the examining physicians were unanimous that in an anterior lumbar interbody fusion at the L4-5 level there is no necessity for the operating surgeon to go below the pelvic brim. Moreover, several of these physicians testified of the great difficulties there are involved in even reaching the parasympathetic nerves below the pelvic brim.
Dr. Reed Fontenot, a urologist, saw Mr. Coody eight months after the surgery in question on referral from Dr. Gunderson. Dr. Fontenot examined Mr. Coody and gave him a snap gauge device to use for three consecutive nights to determine whether he had nocturnal erections. The snap gauge confirmed Mr. Coody’s impotency. Dr. Fontenot then recommended additional surgery for the insertion of a penile prosthesis. After this examination, Dr. Fontenot never again saw Mr. Coody.
At trial, Dr. Fontenot was asked about whether Mr. Coody’s anterior fusion required entry below the pelvic brim. He opined that there would have been no reason for a surgeon to get into the area where the parasympathetics are located, i.e., below the pelvic brim.
After filing this action in proper person, Dr. Richardson’s malpractice insurer, St. Paul Insurance, referred Mr. Coody to Dr. Ismet Caracan at Baylor University Sleep Clinic in Houston. There he underwent three days of testing for impotency. Although Dr. Caracan found evidence of Mr. Coody’s impotency, Dr. Caracan testified unequivocally that the anterior fusion operation itself should not have played any part in Mr. Coody’s impotency because the surgery at the L4-5 level should not have disturbed the parasympathetic nervous system below the pelvic brim.
Dr. Ronald Lewis, a specialist in sexual dysfunction at Tulane University, and now a surgeon at the Mayo Clinic in Rochester, Minnesota, next examined Mr. Coody and conducted numerous objective tests which confirmed that Mr. Coody was neurologically impotent. Nevertheless, Dr. Lewis testified that there was no reason for a surgeon operating at the L4-5 level to be in proximity of the parasympathetics. Likewise, he concluded from the operative reports of Dr. Richardson and Dr. Gunderson that there was no evidence that the surgeons entered the area of the sacral plexus where the parasympathetics are located.
Finally, Dr. Gunderson and Dr. Richardson testified that there were no problems with Mr. Coody’s surgery, that disection was limited to the L4-5 interspace, that they did not explore below the pelvic brim, and that there was nothing done in that surgery that should have rendered Mr. Coody impotent. Their testimonies were corroborated by their post-operative notes *1017 which were written just after surgery, when litigation was not at issue.
Mr. Coody’s impotency was conceded by Dr. Richardson and his insurer both in brief and at oral argument. Nevertheless, they assert that the Coodys failed to prove by a preponderance of the evidence that the anterior lumbar interbody fusion at the L4-5 level caused the impotency. In making this assertion, they point to the total lack of medical evidence that Dr. Richardson injured Mr. Coody’s parasympathetic nerves during this surgical procedure. Additionally, they point to the state-of-the-art testimony of Dr. Lewis that medical science has not yet unraveled what “cordal centers in the upper brain centers that control impotency, [and] how that all plays in for effect_”. Furthermore, Dr. Lewis testified that there is sparse new literature which espouses that disc disease itself may cause impotency.
After carefully reviewing the evidence presented in the case sub judice, we can not say the jury verdict was contrary to the law and the evidence.
RES IPSA LOQUITUR
The Coodys contend that the trial court should have instructed the jury on the doctrine of res ipsa loquitur.
LSA-C.C.P. Art. 1793 provides in pertinent part:
“C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection.” (Emphasis added.)
In the case sub judice, we find only the following objection in the record by the Coodys’ counsel:
“MR. BROUSSARD: I would like to object to the court’s failure to give the plaintiff’s requested charge about the incomplete records the Jury could consider. We had talked about that.
THE COURT: Let it be noted.
MR. BROUSSARD: I would like to file it in the record, Number 10, and also Number 13 and Number 13-A.”
We have ascertained from the record by referring to the Numbers 10, 13, and 13-A that they refer respectively to jury instructions proffered by the Coodys regarding the completeness of medical records (Number 10) and the doctrine of res ipsa loquitur (Number 13 and 13-A). However, we find that the Coodys have not preserved this issue for appellate purposes. Nowhere in the record did they specifically state an objection to the trial court’s failure to instruct the jury on res ipsa loquitur, and detail their reasons for the objection. Accordingly, we find that this alleged error is not properly before us for appellate review.
MISTRIAL
The Coodys contend that the trial court erred when it failed to grant a mistrial when Mr. McLaughlin, co-counsel for Dr. Richardson, commenced his cross-examination of Mr. Coody as follows:
“Mr. Coody, if this case doesn’t prove out, quote, unquote, as you expect, have you had any concern for the damage it’s done to Dr. Richardson and his wife and his family?”
Counsel for the Coodys immediately objected to this question and orally moved for a mistrial. After listening to the arguments of counsel at a bench conference out of the hearing of the jury, the trial court denied the motion for mistrial. Instead, the trial court instructed the jury to disregard the question and to draw no inferences from the statement. Co-counsel for Dr. Richardson then ceased all questioning of Mr. Coody.
Although the Code of Civil Procedure does not expressly provide for a mistrial, broad discretion is vested in a trial judge to grant such a motion where no other remedy would afford relief, or where circumstances indicate that justice may not be done if the trial continues. LSA-C.C.P. Arts. 191, 1631; Spencer v. Children’s Hosp., 432 So.2d 823 (La.1983).
We do not find that the trial court abused its discretion in refusing to grant *1018 the Coodys’ motion for a mistrial. The trial court correctly ruled that the question was improper and admonished the jury to disregard this single question. In light of the termination of co-counsel’s questioning of Mr. Coody with the asking of this one question, we find that the trial judge’s instruction afforded relief to the Coodys, and the circumstances were not such that continuation of the trial prevented the jury from fairly adjudicating the Coodys’ claims against Dr. Richardson.
The Coodys further contend that the trial court should have granted a mistrial when Mr. McLaughlin made improper remarks to the jury in his opening and closing statements. We have reviewed the record of this matter and find that the opening statement of Mr. McLaughlin has not been transcribed; thus, this aspect of the Coodys’ motion cannot be reviewed. Likewise, we have also reviewed Mr. McLaughlin’s closing argument. Although counsel for the Coodys contends that he made numerous objections during that argument to the jury, we find no objections made which are reviewable on appeal.
MOTION FOR JNOV AND NEW TRIAL
The Coodys next contend that the trial court erred in denying their motions for JNOV and, alternatively, for a new trial.
Earlier in this opinion, we thoroughly reviewed and disposed of the issue of whether the jury’s verdict was contrary to the law and the evidence. Accordingly, we shall not again address this issue.
However, as additional grounds, the Coodys contend that they are entitled to a new trial because Mr. Cappel, defense counsel for Dr. Richardson, failed to advise them that he was also defending Dr. Gun-derson, a witness called by the Coodys, in another unrelated malpractice action, and that they were not made aware of the existence of certain X rays taken during the anterior fusion until Dr. Gunderson referred to the X rays during his testimony at trial.
With regard to Mr. Cappel’s representation of Dr. Gunderson, the Coodys argue that this was a conflict of interest and was detrimental to their receiving a fair trial. They contend that Mr. Cappel owed a duty to disclose this relationship to the court so that the Coodys could object to his participation in the trial, and that the jury was entitled to know this fact in evaluating Dr. Gunderson’s testimony.
We preface our remarks on this issue by noting that Dr. Gunderson was not a defendant in this action, and that he was deposed by counsel for the Coodys on November 26, 1985, two years prior to trial. We also point out that the Coodys make no argument that Dr. Gunderson withheld information (other than inferences to the X rays), that he was untruthful in his testimony, or that there was any collusion between Mr. Cappel and Dr. Gunderson to withhold any evidence. We likewise have reviewed the record, and find that there is no evidence that Mr. Cappel’s representation of Dr. Gunderson in the unrelated matters encompassed any claim that Dr. Gunderson’s surgical procedures rendered anyone impotent.
Having made those prefatory statements, we will first address the question of the X rays to which Dr. Gunderson referred. The Coodys contend they were entitled to a new trial because they learned for the first time during Mr. Cappel’s cross-examination of Dr. Gunderson that he and Dr. Richardson had taken X rays during the course of Mr. Coody’s surgery which indicated that they were at the proper L4-5 level, above the pelvic brim. They contend that they subpoenaed Dr. Gunder-son’s medical records for use at trial and these X rays were not produced.
We have thoroughly searched the record of this trial and fail to find the subpoena to which the Coodys refer. Accordingly, we can not ascertain the scope of the subpoena which the Coodys requested. Therefore, we have no evidence before us which would indicate that Dr. Gunderson failed to produce subpoenaed items.
In reviewing the record, we also note, quite significantly, that it was not during cross-examination of Dr. Gunderson that counsel for the Coodys learned of the X rays. Rather, it was under direct examina *1019 tion by counsel for the Coodys that Dr. Gunderson referred to the X rays as independent proof that the surgeons did not go below the pelvic brim in performing surgery on Mr. Coody. The X rays were not shown to the jury and were not introduced into evidence.
Our review of the record reflects that Dr. Gunderson’s testimony came on the morning of June 29, 1988, the third day of trial, and that at no time prior to the conclusion of the trial on July 1, 1988, did counsel for the Coodys seek a court order for Dr. Gunderson to present the X rays for examination. Therefore, we find that the Coodys have failed to establish that they were entitled to a new trial because of the unavailability of this evidence.
We now turn our attention to the Cood-ys’ contention that they are entitled to a new trial because of Mr. Cappel’s failure to disclose his representation of Dr. Gunder-son in other matters. In appellate brief, Mr. Cappel candidly admits that at no time did he divulge his representation of Dr. Gunderson in an unrelated case.
The crux of the Coodys’ argument on this issue rests on their contention that Mr. Cappel’s relationship with Dr. Gunderson was a conflict of interest in this ease and was detrimental to their receiving a fair trial.
Although we are in agreement with the proposition that an attorney may not represent different interests which are in conflict with one another, see Plaquemines Par. Com’n Council v. Delta Dev. Company, 502 So.2d 1034 (La.1987), and cases cited therein, we do not perceive a conflict of interest in the case sub judice. As pointed out in the Coodys’ appellate brief, “... Dr. Richardson’s interest in defending the merits of this suit was entirely different and separate from that of Dr. Gunder-son, who though a participant in Mr. Coody’s surgery, was not made a party by the plaintiffs.” As pointed out herein-above, there has been no showing by the Coodys that Dr. Gunderson withheld information, or had such an interest in the outcome of this action such that he might benefit, directly or indirectly, by a decision favorable to Dr. Richardson. We also note that neither in deposing Dr. Gunderson nor during examination of this doctor at trial, did counsel for the Coodys question him about his involvement as a defendant in other medical malpractice actions. Therefore, we find that the trial court did not abuse its discretion in denying the Coodys’ motion for a new trial on this ground.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the Coodys.
AFFIRMED.
*1020 APPENDIX "A"
[[Image here]]

. Prior to the surgery in the case sub judice, Mr. Coody had a lower back fusion in 1974, an anterior cervical fusion on November 1, 1982, a posterior lumbar fusion (the precursor of the present surgery) in January 1983, and a posteri- or cervical fusion in July 1983. In addition, Mr. Coody was hospitalized also in 1983 for cardiac complications, as well as hospitalization in September 1983 for a gunshot wound.