582 So.2d 871 (1991)
Kimberly S. MOORE
v.
HEALTHCARE ELMWOOD, INC. and Lee R. Domangue, M.D.
No. 91-CA-41.
Court of Appeal of Louisiana, Fifth Circuit.
June 5, 1991.
*872 C.A. Fleming III, Boggs, Loehn & Rodrigue, New Orleans, for Lee R. Domangue, defendant-appellant.
Ronald W. Morrison, Metairie, for Kimberly S. Moore, plaintiff-appellee.
Jeffery P. Lozes, Lozes & Cambre, New Orleans, for Haydee DeLorimier, third-party defendant/appellee.
Before KLIEBERT, and DUFRESNE, JJ., and FINK, J. Pro Tem.
ELORA C. FINK, Judge Pro Tem.
This is a medical malpractice suit in which the plaintiff sued a hospital and an emergency room physician, claiming the physician was negligent in removing a cast from her arm. The plaintiff asserted the doctor cut her skin with the cast-cutting instrument, resulting in two wounds on her right forearm that left noticeable and unsightly scars. After malpractice review panel proceedings were stymied by the panel's inability to reach a conclusion, the plaintiff filed suit. The physician filed a third-party suit against the plaintiff's nonphysician friend who had applied the cast to the plaintiff's arm.
The hospital settled prior to trial. After a bench trial, the district court awarded judgment in favor of the plaintiff, Kimberly Moore, who was awarded damages in the amount of $8,500 plus interest, costs and expert fees. The remaining defendant, Dr. Lee R. Domangue, appeals; the plaintiff has answered the appeal, seeking an increase in quantum.
The issues on appeal are, first, whether the trial judge erred in finding Dr. Domangue's care and treatment of the plaintiff deviated from the requisite standard of care; second, whether the trial judge erred in failing to find fault on the plaintiff's part and/or on the part of the third-party defendant, Haydee DeLorimier; third, whether the damages award was inadequate.

FACTS

Kimberly Moore
At the time of her injury Kimberly Moore was an 18-year-old junior college student. On Saturday, September 12, 1987, she attended a high-school dance with her boyfriend. During the course of the evening she imbibed from five to seven drinks containing alcohol. When she awoke the next morning, she discovered her right wrist was limpshe could not keep it raised. She felt no pain, but she could feel some hot/cold sensations and felt something like a numbness.
Assuming the problem would correct itself, Moore wrapped the wrist with an elastic bandage to immobilize it. Thereafter she pursued her planned activities for the day, which included competing in a mixeddoubles tennis tournament. In order to play, however, she had to tape her hand, wrist and forearm to the tennis racket.
By 8:00 that evening the problem had not resolved itself. Moore asked her boyfriend's mother, Haydee DeLorimier, to help her because Mrs. DeLorimier worked at a hospital. (Although DeLorimier had worked as a nurse's aide in the past, at the time of this incident she was employed as a hospital clerk.)
DeLorimier told Moore she should see a doctor but, after some coaxing, she agreed to help Moore. She wrapped Moore's arm with several thin strips of plaster-impregnated gauze bandage, covering the area from the knuckles almost to her elbow. Moore promised to see a physician the next day after class and promised to watch for swelling, discoloration or discomfort. DeLorimier instructed Moore to soak the cast off in the event it started to create problems.
*873 Moore testified the cast was loose enough for her to put a finger under it and DeLorimier tested its looseness several times as the cast hardened.
The following day, after attending classes from eight a.m. until past noon, Moore walked from her school to nearby Elmwood Medical Center to find out what was wrong with her wrist. In the Emergency Room she gave admission information to a nurse, stating her symptoms had appeared when she woke up Sunday morning. She denied telling anyone she received the injury after a fall.
She was examined by Dr. Lee Domangue, who asked her where the cast came from, but not how it had been applied. He did not test her fingers. He decided to remove the cast by cutting it off. Moore testified she asked him if he could soak it off with warm water, but he told her no, it would be too messy and he would still have to use the cutter.
Using a cast-cutting machine, Domangue sliced a longitudinal line through the plaster on either side of the arm, in line with the pinkie and the thumb, respectively. Moore testified he told her that the cutter would create heat and noise but was designed not to cut skin; he did not warn her the cutter could penetrate her skin. Consequently, although she began to feel a lot of heat while the cast was being removed, she did not tell the doctor. She testified she felt some pain and grimaced, but did not ask him to stop cutting because she did not think the process could be halted. The doctor never inquired whether she was uncomfortable.
After the cast was removed, the doctor told Moore to wash the excess plaster off her arm at a washbasin, at which time she discovered long cuts on either side of her arm along the pathway of the cast-cutter. Moore stated she began to cry upon seeing the cuts, but the defendant neither responded to this discovery nor did he do anything to treat the wounds, although he did manipulate her fingers.
Domangue then sent Moore for X-rays and, when she returned, he informed her he had made an appointment for her to see Dr. David Aiken, an orthopedic surgeon, the following day. Domangue then set her arm in a splint (a half-cast) and discharged her, without telling her what was wrong with her arm. Moore stated her arm's condition did not improve after the cast was taken off.
Moore went to Dr. Aiken as scheduled. When he removed the splint to examine her arm the cuts began to bleed because the skin had adhered to the bandage portion of the splint. Aiken suspected nerve damage and ordered more X-rays; he then applied a new splint and scheduled her for another visit. Moore did not return to Aiken, however, because she had decided to see Dr. Donald Faust, another orthopedist, who had been recommended by some of her friends who were tennis players.
She saw Dr. Faust several days later, but failed to return to him also because he also failed to make a diagnosis and she could not afford more X-rays.
Moore testified her wrist problem cleared up by itself in approximately ten weeks, but the scars from the cast removal remained. She did not seek surgical revision of the scars until 1990 because she was unaware such treatment was available.
On cross-examination, Moore admitted she knew that DeLorimier was not a nurse when she asked her to help, but said she thought DeLorimier was some type of supervisor at the hospital. Moore insisted that the cast was not tight after it hardened, stating that she could slide a finger under it to scratch and she could move her fingers up and down slightly. She reiterated that there was no improvement after Domingue removed the homemade cast or, for that matter, after she went to the specialists. She stated that after the cast was cut open it did not stick to her skin but only left a residue of plaster dust on her arm. She said, in addition, that there was no one else waiting in the Emergency Room when she arrived and she was seen promptly.

Haydee DeLorimier
Haydee DeLorimier's testimony regarding her application of the cast to the plaintiff's *874 arm was essentially the same as Moore's. She stated she cut a few thin strips of plaster gauze material, wet them, and put on a few layers. She testified she had been a nurse's aide at one time many years ago and was aware of the danger of wrapping a cast too tightly. She insisted she carefully tested the cast as it hardened and that she could put a finger between the cast and the arm. She told Moore that, if the cast caused swelling or discoloration, to hold it under warm water to help it disintegrate and then to cut it off with scissors, since it was thin.
DeLorimier admitted she had neither padded the cast nor placed any intervening material between the plaster and the skin. She admitted she had never seen a cast applied without a pad, but stated that she had seen a cast removed by soaking, at the hospital where she worked. She agreed that only a physician should apply and remove casts.

Hospital Records
The emergency room report related that Moore presented herself complaining of wrist weakness with limpness, no pain, and no feeling; that she had been placed in a cast material device by her boyfriend's mother; that "trace edema" was present; that the patient said her grip, etc., had not returned.
The physician's notes in the report, written by Dr. Domangue, state that the plaintiff was alert and oriented, was experiencing no pain, poor grasp, intact sensation, inability to extend wrist, loss of radial nerve motor function, and partial loss of medial and ulnar motor function. He noted there was no neck, elbow or forearm swelling, nor any deformity or abnormality, but he ordered X-rays of the patient's elbow. These notes also stated that the patient had plaster without padding around the wristhand that was removed by cast cutter and that "superficial epidermal disruption" occurred due to the absence of padding. Dr. Domangue noted further that he placed a splint on the wrist, set up an appointment with Dr. Aiken for the following day, and discharged the patient.
In an undated narrative report Domangue dictated subsequently, he stated the injury was to the plaintiff's elbow and was caused by a fall. He reported, erroneously, that the home-made cast covered her elbow. He stated it was apparent the hand was swollen and he had concluded the cast was creating a compressive band, causing significant neurovascular compromise.
In the narrative Domangue stated it was his opinion, "then and now," that removal of the cast was paramount to minimize additional injury. He said the cast was applied tightly and he could not determine that there was no material intervening between the cast and the patient's skin. He stated further that the patient failed to complain during the cast-cutting procedure, which was performed in a "typical bivalve fashion." He noted that her inability to feel had contributed to her failure to complain.
Domangue stated further that after the cast was removed two "linear superficial disruptions" five to six inches long were discovered along the forearm where the cutter penetrated the "thin" cast material. He claimed that the injuries were immediately pointed out to the plaintiff and that she was instructed as to daily care of the wounds. He then reiterated the gist of the Emergency Room Report and noted the reason he had Moore's elbow X-rayed was because "this was the area of initial concern."

Dr. Raul Guevara
The plaintiff presented the testimony of Dr. Raul Guevara, an expert in emergency room medicine. He stated that some swelling is to be expected when a cast is applied, the degree of which is determined by the tightness of the cast and the length of time it has been worn. After reading the hospital records, Dr. Guevara did not think a neurological or vascular emergency existed when plaintiff presented herself at the emergency room. He pointed out that no significant difference was shown in the plaintiff's appearance or complaints before and after the cast removal.
Dr. Guevara testified he once saw a plaster splint applied next to the skin; he believed *875 such a cast could be moistened to loosen it and then "teased" off by using a tongue-depressor blade to lift it.
Dr. Guevara described the procedure for using the cast-cutter as a vertical up-and-down motion. If the cutter had been used in that manner, he stated, he would expect the cuts to have a periodic pattern, unlike plaintiff's scars, which showed long continuous cuts.
On cross-examination, Dr. Guevara admitted that if the cast material was thinlyapplied the chances of injury to the skin on removal were increased. He also stated that although the swelling might indicate vascular impairment, it would depend on the severity of the swelling. He admitted it was reasonable to cut off rather than soak off the cast because of the risk that there might be nerve impairment. He noted he himself had never attempted to soak a cast off and agreed the symptoms of numbness and lack of pain could indicate a nerve involvement.
Dr. Guevara also agreed that a circumferential cast applied without padding increases the risk to the neurovascular system. The padding also allows a larger margin for error in removal of the cast, because without it skin tends to adhere to the plaster material. If the skin adheres firmly enough it can be cut, because the cutter is designed to cut rigid material rather than soft, mobile skin, which retreats from the blade.
Dr. Guevara testified that a significant change in plaintiff's feelings, sensation and finger mobility after the cast was removed would indicate the cast was causing neurovascular problems. To determine whether an emergency existed, however, he would perform a few basic sensory and motor tests, such as pinpricks and visual inspection for discoloration and/or movement of the fingers. He also stated he would be extra-careful in removing a homemade cast and would interrogate the patient on how it had been applied, because it is not always possible to determine visually whether a cast is padded.

Dr. Patricia Farris
Patricia Farris, M.D., an expert in dermatology, testified regarding the plaintiff's scars. She noted that Moore sought treatment in January 1990. At that time, Dr. Farris said, one scar was "fine" because it was flat and she recommended no treatment. The other scar, however, was raised and prominent; Dr. Farris injected it with a cortisone solution, to try to flatten it. The treatment was partly successful, but Dr. Farris recommended an additional injection be made. She noted that, although the scars will never disappear completely, their appearance will improve with the passage of time.

Dr. Lee Domangue
The defendant testified in accordance with his narrative report. He added, however, that the patient had complained about the cast. He also contended the "trace edema" (which he defined as visibly-noted, measurable swelling), along with her other symptoms, indicated a potential neurovascular compromise which, if it existed, required immediate removal of the cast to prevent further damage. He insisted that the cast was extremely tight and that after it was removed the swelling went down.
At any rate, he stated, the plaintiff definitely had a nerve compression, but he admitted he could not tell whether it was caused by the cast. Nevertheless, he felt the too-tight cast was causing a problem. He said he rejected the suggestion of soaking the cast to remove it because of the time requiredwhich he estimated would be from four to 24 hoursand the potential for nerve damage.
Domangue contended that plaintiff's arm was cut because there was no padding under the cast and he claimed he had no way to determine that fact visually. He stated he used the cutter in the proper "walking" motion. Contrary to the plaintiff's testimony, the defendant asserted that after the cast was removed there was a noticeable change, in that the swelling went down and sensation became intact.
The defendant admitted he performed no objective tests (e.g., pinprick, cotton-ball) to measure the patient's ability to feel. Because *876 of her complaints, however, he believed there was a neurovascular compromise and he felt time was of the essence in removing the cast.
On cross-examination, Domangue admitted the emergency room nurse's notes do not report that plaintiff's fingers had no feeling. He also admitted the hospital record does not report any measures to treat plaintiff's wounds following their discovery. He alleged, however, that it was common procedure to put an antibacterial ointment on injuries of this nature.
Although the defendant contended at trial that on Moore's arrival at the emergency room she said she could not feel anything, his emergency room notes state she was not in distress. He admitted there was no discoloration in the fingers when he examined the plaintiff and that he did not question her as to how the cast was put on.

Defense Experts
Domangue presented the testimony of three expert physicians in his defense: Dr. Richard Bucci, an emergency room physician; Dr. Donald Faust, an orthopedist specializing in hand surgery; and Dr. David Aiken, another orthopedic surgeon. All asserted the evidence at the time the plaintiff was seen by the defendant pointed to a potential neurovascular compromise. They also testified as to the proper method of removing a cast; their testimony agreed with that of Dr. Guevara and the defendant. The three physicians all asserted a circumferential cast should not be applied without padding because the padding protects the skin from wet plaster, provides room for the extremity to move, allows for some expected swelling, and permits easy removal of the cast. Their testimony brought out the fact that plaster adheres to the skin and its covering of fine hairs; thus, these experts opined, there was no way to remove the cast without a high risk of cutting the skin. Further, if the cast was tight the risk was increased, because the physician could not see under the cast and the plaintiff's lack of sensation would prevent her warning him.
In his testimony Dr. Bucci added that a tight cast would reduce blood supply, which could damage the nerve tissue. He stated the process could take place slowly over 18 hours or it could occur acutely. He opined he would have removed the cast regardless of the risk of cutting the patient under these circumstances because cosmetic result would be secondary to the neurovascular emergency.
On cross-examination Bucci admitted that, if a patient's feeling or lack thereof was not significantly changed after the cast was removed, an emergency may not have existed. He also stated he had never seen such scars before from a cast removal, but pointed out he had never seen a circumferential cast without padding either.
Both Dr. Faust and Dr. Aiken had seen the plaintiff one time each. Both believed the condition was probably Saturday Night Palsy, a nerve impingement caused by lying on a limb for a long time. It may occur when a person has imbibed a substance that causes a sleep so heavy the victim is not awakened by the normal discomfort of the body's weight on the limb. This creates a temporary paralysis of the nerve in the affected limb, but the victim eventually recovers spontaneously. All the doctors asserted a circumferential cast was definitely an inappropriate treatment for Saturday Night Palsy.
Faust and Aiken also agreed with Bucci that, given the defendant's version of events, it was reasonable to fear a neurovascular compromise and to remove the cast quickly.
Dr. Faust testified that, after examining Moore on her single visit to him, he was unsure of the diagnosis, but did not believe there was nerve root entrapment. He stated a tight cast would produce the symptoms exhibited by the plaintiff. He explained that a cast cutter is not designed to cut mobile skin, but to cut hard or immobile surfaces. Thus, when the skin adheres to the cast, the cutter would cut it because it was immobilized. He stated that, even under the best circumstances, the cutter occasionally will nick a patient.
*877 On cross examination Dr. Faust, who applies approximately ten casts a week, said he would test a patient who came in wearing a homemade cast and who had the plaintiff's symptoms. His usual tests are to perform pin pricks, to feel the fingers for swelling, to pinch the fingers with a paper clip, and to use a cotton ball. If the cast was loose, he admitted, it would not be unreasonable to use a tongue depressor to protect the skin from the cast cutter or to use scissors to remove the cast, if it was thin.
Dr. Aiken's testimony agreed in essence with that of the other defense witnesses. He stated additionally that a circumferential cast would cause Saturday Night Palsy to worsen. Given the circumstances described by the defendant, he stated, time was of the essence in removing the cast, because damage from a too-tight cast could occur within twenty minutes. He also stated removal by hot water, in addition to being too slow, would increase the swelling. On the other hand, he said, if the cast was not too tight he would have a different opinion. Yet, he stated, a problem could exist regardless, since there can be swelling inside the cast which is not noticeable.

LAW
The burden of proof in a medical malpractice action is set forth in LSA-R.S. 9:2794 as follows, in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq. * * *, the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians * * * licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians * * * within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
B. Any party to the action will have the right to subpoena any physician * * * for a deposition and/or testimony for trial to establish the degree of knowledge or skill possessed or degree or care ordinarily exercised as described above without obtaining the consent of the physician * * * who is going to be subpoenaed. The fee of the physician * * * called for deposition and/or testimony under this Section will be set by the court.
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician * * *. The jury shall be further instructed that injury alone does not raise a presumption of the physician's * * * negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
See Pitre v. Opelousas General Hosp., 530 So.2d 1151 (La.1988); Richoux v. Metropolitan Gastroenterology, 522 So.2d 677 (La. App. 5 Cir.1988); Harmon v. Levenson, 534 So.2d 486 (La.App. 5 Cir.1988); Martin v. East Jefferson General Hosp., 571 So.2d 895 (La.App. 5 Cir.1990).
In order to determine whether the plaintiff has met this burden, courts rely on expert witnesses who are members of the defendant's profession and who are qualified to testify. Harmon v. Levenson, *878 supra. The expert views are persuasive, but are not controlling, and the weight to be given their testimony is dependent upon the expert's qualifications and experience, as well as upon the facts. Id.
The absence of expert testimony that the physician breached the proper standard of care precludes imposition of liability. Peters v. ABC Ins. Co., 552 So.2d 430 (La.App. 4 Cir.1989). In addition, when the plaintiff's expert would have chosen a more common procedure than one used by the defendant which is less common but accepted, the plaintiff has failed to prove a deviation from the standard of care. Smith v. Gottsegen, 535 So.2d 1330 (La. App. 5 Cir.1988).
The treatment rendered the patient must be analyzed in light of the facts known to the defendant when the patient was treated and not on the basis of hindsight or what is later learned. Lindsey v. Michigan Mutual Liability Co., 156 So.2d 313 (La.App. 4 Cir.1963), writ denied, 158 So.2d 612; Ogletree v. Willis-Knighton Memorial Hosp., 530 So.2d 1175 (La.App. 2 Cir.1988). Where it is equally plausible that the injury occurred from another cause as from the defendant's negligence, liability cannot be imposed because the plaintiff has failed to prove it more likely than not that the injury resulted from the defendant's negligence. Cangelosi v. Our Lady of Lake Medical Ctr., 564 So.2d 654 (La.1990); Martin v. East Jefferson General Hosp., supra.

ANALYSIS
The defendant asserts the evidence proves he acted reasonably and expeditiously to remove an excessively tight homemade cast that was an inappropriate treatment for the plaintiff's condition and that his hastiness in removing it was necessary to prevent or curtail a possible limbthreatening situation.
The plaintiff rebuts these allegations by stating there is no manifest error in the trial judge's conclusions. She points out that she was in no distress, that the cast was not tight, that the defendant failed to ascertain the facts by performing tests or by questioning her, and that he also failed to explain to her that the cast cutter could cut the skin if there was no padding under the cast.
She further notes that the line of the scars shows the defendant manipulated the cutter improperly, moving it in a straight line rather than in a proper "walking" motion, which would produce cuts that looked like a perforated line. She also states the evidence fails to reflect that the defendant was concerned with neurovascular compromise when he treated her or that she exhibited such symptoms.
The central issue is whether Dr. Domangue used a reasonable method to remove a cast he knew was homemade and, knowing he was working blind, he failed to inquire in detail as to how it was put on. Given his scenario that he believed a neurovascular emergency existed, three physicians supported his judgment and actions. They vacillated, however, given plaintiff's version that she was not in distress, the condition had not changed since it appeared, no change was noted after the cast was removed and the same symptoms continued until they gradually faded away.
In his oral reasons for judgment, the judge found negligence and malpractice on the part of Dr. Domingue. He specifically stated the defendant, whose "expertise is unquestioned, acting in his own fears", left scars on the plaintiff's arm in removing the cast. He stated he did not think a neurovascular compromise had been demonstrated and, therefore, he found in favor of the plaintiff and in favor of the third-party defendant.
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). That applies in medical malpractice cases as well as in ordinary suits. Richoux v. Metropolitan Gastroenterology, supra; Malbrough v. Hamsa, 463 So.2d 639 (La. App. 5 Cir.1984); Protti v. Tolmas, 459 So.2d 614 (La.App. 5 Cir.1984).
*879 We find no manifest error in the trial court's findings. We point out, however, that the question of whether a neurological-vascular involvement existed is not determinative of the defendant's liability. It is the issue of whether, following the standard of care in his profession, he acted in a reasonable belief that an emergency existed. This issue involved contradictory testimony and, thus, credibility findings by the trial court.
Examining the evidence under the manifest error standards enunciated in the cases cited above, we find no error in the result reached by the trial judge. The scenario presented by the defendant as justification for his hasty and careless removal of the cast was not borne out by the other evidence, in particular the hospital record and the defendant's own contemporaneous notes. The defense experts' opinions supporting Domangue's actions were predicated on an emergency situation; even these experts admitted that, given a non-emergency situation, Domangue more likely than not could have removed the cast without damaging the plaintiff. Further, the very appearance of the plaintiff's scars negates the defendant's claim that he used the proper method in operating the castcutter.
Nor do we find merit to the defendant's claims that the court erred in failing to attribute fault to the plaintiff and/or to DeLorimier. The proximate cause of the plaintiff's injury was not the application or the presence of the home-made cast; it was the defendant's removal of the cast without taking proper precautions.
In her answer to the appeal the plaintiff requests an increase in damages. The trial judge noted he believed the plaintiff was lucky her scars were lighter than they might have been and that, according to the testimony, they will fade significantly with the passage of time. As a result, he awarded her $8,500.
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded it in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Given the facts here, we conclude the award is not an abuse of the trial court's discretion. See Canter v. Koehring Co., 283 So.2d 716 (La.1973).
For the foregoing reasons, the judgment of the district court is affirmed. Costs of this appeal are assessed against the defendant-appellant, Lee R. Domangue.
AFFIRMED.
KLIEBERT, J., concurs.
KLIEBERT, Judge, concurring.
I concur in the results reached by the majority writer, but not necessarily for the reasons stated in the majority opinion.