679 So.2d 446 (1996)
Shirley PAYTON
v.
CITY OF NEW ORLEANS and ABC Co.
No. 96-CA-0109.
Court of Appeal of Louisiana, Fourth Circuit.
June 26, 1996.
Rehearing Denied September 26, 1996.
*447 Ernest Lee Caulfield, Maurice A. Williams, New Orleans, for Plaintiff/Appellee.
John E. Smith, Deputy City Attorney, Nolan P. Lambert, Chief Deputy City Attorney, Avis Marie Russell, City Attorney, New Orleans, for Defendant/Appellant.
Before SCHOTT, C.J., and JONES and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Shirley Payton sued the City of New Orleans (City hereinafter) for damages allegedly sustained when she slipped and fell on a broken sidewalk located in the 200 block of South Saratoga Street in New Orleans. The petition alleges acts of negligence, violation of the laws of the State of Louisiana and Ordinances of the City, and the City's strict liability for the defective sidewalk. The City answered, generally denying liability and pleading Payton's comparative negligence and assumption of risk. Payton amended her petition, adding a claim for injury to her back to her original claim for injury to her knee, and the City answered with a general denial. Payton again amended her petition to add as a defendant the Institute of Mental Hygiene (Institute hereinafter) and its insurer, alleging that the Institute was the owner and/or lessor of the area where Payton was injured and was responsible for its maintenance, upkeep, repair and/or construction and alleging acts of negligence, violation of laws and ordinances and strict liability. The Institute answered and filed a third party demand against its lessee, the Administrators of the Tulane Educational Fund (Tulane hereinafter), claiming contractual indemnity pursuant to their lease agreement. On 9 February 1994, Payton filed a third amending petition adding Tulane as a defendant, to which Tulane filed a general denial including allegations of Payton's comparative fault and a worker's compensation defense. The Institute moved for and was granted a Summary Judgment on 15 April 1994 dismissing Payton's claim against it. Payton moved to dismiss the Institute without prejudice, which motion was granted. The Institute dismissed its third party claim against Tulane. On 27 June 1994, Payton dismissed without prejudice her claim against Tulane, reserving her rights against the other defendants.
Following a bench trial held on 26 July 1995, the trial judge rendered judgment in favor of Payton and against the City in the following amounts:

For Payton's pain and
suffering $100,000.00
For Payton's lost wages
to date of trial 86,720.00
For Payton's future lost
wages 137,822.00.

The trial court found Payton 33% comparatively negligent and assessed costs and $2,000 for expert fees against the City. From that judgment, the City appeals. We affirm.

STATEMENT OF FACTS
Payton testified that she was born in May, 1953, and holds a business administration diploma from Meadows-Draghan College. She worked at Slidell Memorial Hospital for approximately five years as a nursing assistant and, in 1979, went to work for Tulane *448 Medical Center (TMC hereinafter), where she earned approximately $8.00 per hour at the time of the accident. At TMC she ordered supplies for the operating room, anesthesia department and recovery room, and ran errands to different area hospitals to borrow instruments.
On 18 March 1985, she was working in the Tulane operating room when she was asked to go to EENT Hospital on LaSalle Street to obtain a lens needed for eye surgery that was then under way at Tulane. On her way to the hospital, she stepped from the sidewalk, not in the pedestrian crosswalk, to cross the street when she slipped in a hole surrounded by grass, twisted her ankle, back, right side and knee and fell down on her hands. She testified that her knee swelled. She testified that she had not noticed the hole prior to the accident. She identified photographs taken by her sister-in-law as representing the scene of the accident, essentially as it was on the day of the accident. She sought medical treatment from Dr. Haddad at TMC, complaining of a burning in her back and swollen knee. She underwent arthroscopic surgery on her knee, performed by Dr. Michael Brunet[1], was subsequently on crutches, wore a knee brace and had physical therapy at TMC. During the course of her treatment, Payton developed additional back problems, including numbness in her right foot at and above the toes and burning and pain in her back. Dr. Brunet referred her to Dr. Leon Weisburg and to Dr. David Aiken for examination of her back complaint. She discontinued wearing the knee brace because it interfered with her ankle and caused her leg to remain swollen.
She was first seen by Dr. Olson in August of 1991, and last saw him one or two months prior to trial. He prescribed Vicodin for her back pain. She continued to take Vicodin and Naprosyn for pain and inflammation. Payton testified that she continues to suffer pain in her knee, off and on, all the time, and is unable to walk continuously for an hour or two. She continues to take Vicodin and Elavil to help her to sleep. She has been taking medication for the ailment for the past ten years. She testified that her knee continues to swell, and she uses cold, heat and elevation. She also testified to bladder and bowel problems that prevent her from taking long drives without frequent rest stops. She was under the care of Dr. Brunet and Dr. John Olson at the time of trial.
Payton testified that although she tried to go back to work after the injury, her leg swelled and she was in pain. She complained of swelling in her leg and burning in her back upon standing. She last attempted to go back to work in 1986, and has experienced tenderness and pain since then. Her physicians recommended back surgery to relieve the pressure of a disk on a nerve in her spine, but she testified she doesn't want surgery unless it were to prove unavoidable. Her thirteen and fifteen year old children and her husband help her with her housework. Payton testified that the injuries have adversely impacted her quality of life. She is unable to do things with her children, and her marriage has been affected, both emotionally and sexually. She can no longer bowl or pursue her hobbies, such as skating and skiing with her children, because of her pain.
Dr. Leon Weisburg, a neurologist, testified that he saw Payton on several occasions beginning in the summer of 1986. According to her history, she had injured her knee and had developed pain in her lower back with numbness radiating into her right lower extremity following the knee injury. The back problem was recorded by Dr. Brunet, who was one of the first doctors who had seen Payton following the accident. During the course of his evaluation of Payton, he found a mechanical abnormality in her lower back causing lower-back pain with radiation down into the leg, and no evidence of a herniated disk that would require surgery. Because of the persistence of the lower-back pain syndrome, he considered a myelogram. No abnormality was found, and the only explanation he offered for the lower-back pain was a mechanical abnormality caused by her splinting, *449 or the way she walked, as a result of the knee injury. He recommended physical therapy to improve the knee injury so that she would walk in a more normal manner. This would cause the symptoms in her back and lower leg to resolve with time. Her symptoms had not resolved the last time he saw her in 1991, and he testified that the symptoms, not having resolved between 1986 and 1991, will not resolve and will remain unchanged. He wrote in 1987 to TMC's insurer that Payton could not return to work in her previous occupation. The injury that she suffered to her knee caused her to have an imbalance in her lower extremities so that she put a strain on the lower back that caused mechanical abnormalities in the lower back with possible nerve root compression or possibly some involvement of the deeper structures which caused the radiation of pain into her leg.
Dr. David Aiken, Jr., an orthopedist, testified that he saw Payton on 12 July 1988 and 30 August 1988. He reviewed Dr. Weisburg's records, which showed that an EMG test in June, 1986 showed some nerve damage on the left side from L4 to S1 and some nerve damage on the right side from L5 to S1. A myelogram was performed at Charity Hospital in August of 1987 which was normal. When she saw Dr. Aiken, she was complaining of daily intermittent low-back pain, aggravated by activity, and constant pain in the right leg around the knee. She also complained of a dull ache in the entire right calf, and the right ankle, and of numbness in the top of the right foot. Payton told him she had no back problems prior to the 1985 slip and fall. He found swelling of the entire right leg, arthritis of the knee where she had some crepitus of the knee. When he moved her knee, there was a "crackly feeling" in it because the cartilage was no longer smooth. He found tenderness in the low back and full range of motion without muscle spasm. She had some numbness in the top of her right foot and there was no knee reflex on the right side patellar-tendon reflex on the right side, which is an indication of some amount of nerve irritation. She also had mild swelling of the right ankle which appeared to have been sprained and was still slightly swollen. He ordered a CT and MRI scan on 12 July 1988, which showed no ruptured disks. He felt at that time she had reached maximum medical improvement. He testified that she had chronic lumbar sprain, early degenerative arthritis of the knee and chronic sprain of the right ankle, which combined to give her a permanent partial impairment of about 5 percent. He testified that the ligaments, capillaries, small blood vessels and tissues in her back were probably torn because she had a severe strain. These tissues do not rejuvenate and end up as scar tissue. This scar tissue, which does not show on an X-Ray, blocks the flow of blood in the particular affected area and causes pain. He did not believe that surgery would improve her condition. Dr. Aiken told Payton she should avoid lifting more than 40 pounds at any one time, and she shouldn't repeatedly bend or stoop. She should avoid excessive use of the stairs, and she shouldn't be required to sit or stand in one position for more than an hour. He testified that she would be 40 to 50 percent disabled from the type of work she had performed prior to the accident.
Dr. John D. Olson, a neurologist, testified that he first saw Payton on 14 August 1991. Payton complained of back and neck pain following a slip and fall incident in 1985. His physical examination suggested some changes in L5 bilaterally, and he thought she might have a damaged lumbar disk. She underwent an MRI scan at Hotel Dieu on 16 August 1991, which showed an annular bulge at L5-S1 which he attributed to the slip and fall. He saw her again on 3 September 1991, at which time she was still having significant pain and discomfort. He found dorsiflexion of the feet, and changes suggestive of L5 neurologic involvement, and ordered an EMG (nerve conduction study) of the lower extremities, which was performed on 9 October 1991. She still complained of back and neck pain, and some swelling of her neck. She was taking nonsteroidal anti-inflammatory agents at that time. She returned on 7 November 1991, with no major change in her examination or complaints. She had not improved and continued to be symptomatic. Dr. Olson told her to restrict physical activity, to watch her weight, which was not a problem for her, and to avoid lifting. Dr. *450 Olson testified that her disability related to factors that took place prior to his having seen her. She had a back problem and a significant knee problem, and would have done better in a sedentary occupation. During the course of his treatment and evaluation, he found no marked changes in her clinical complaints. He prescribed an Opioid for pain. He had a repeat MRI scan done at Baptist Hospital on 14 June 1995, which showed changes at L5-S1 and L4-5, a bulge in the annulus fibrosus at L4-5 and some facet joint changes at L5-S1, but these were not dramatic changes. Over the course of his treatment, Payton has had some worsening, but not dramatic worsening. He described this as "a pretty characteristic course for somebody with bad joints and an injured back."
Bobby S. Roberts testified as an expert in the field of vocational evaluation and testing. He evaluated Payton on 10 July 1995 and concluded that she falls within the average academic range. Her interest is in skilled science, where she had trained and where she had worked the majority of her work history. He found she had some trouble coping, got nervous and anxious. Functional testing revealed she could sustain tolerance at the sedentary level, seated in the 10 to 15 minute range. Rest did not improve her symptoms of back, leg and hip pain once those systems had manifested themselves. She had trouble working while standing, and demonstrated visible swelling in her right lower extremity, from the knee down. She also had trouble flexing at the waist up to 30 degrees. Light work requires a person to stand up, bend forward and work with the arms. She could not do this at the 30 degree range. His summary was that she has a physical intolerance to sustained work and visible, noticeable swelling in the right lower leg, and swelling and burning at the base of the spine. The testing reflected that she did not meet the criteria for employment. He recommended that she be evaluated by a medical specialist, that she be further evaluated and treated in regard to her lumbar and radiational pain, that she continue medical evaluation in regard to her right knee symptoms, and that she be referred to a board-certified social worker for possible further psychological evaluation or treatment. He concluded she should be medically retired and under some kind of regimen and medically supervised treatment program. During five hours of testing, her maximum sustained capability was 10 to 15 minutes, she had symptoms, and could not assume basic required postures.
Dr. Melville Z. Wolfson, an expert forensic economist, testified from Payton's birthdate, the date of the accident, and her W-2 forms for 1983-84, and TMC's payroll records for the months she worked in 1985. He calculated her lost income from the date of the accident to the date of trial to be $156,880. He calculated future lost earnings through age 60, assuming she could earn minimum wage and assuming an annual 4.1 percent increase, at a present value of $137,822.
FIRST ASSIGNMENT OF ERROR: Whether the trial court erroneously concluded that the area where plaintiff was allegedly injured was a public sidewalk.
The City contends that the photographs identified by Payton show that she fell on a slope leading to the entrance to a parking lot, and not on a public right of way for which the City would be responsible. We have reviewed the photographs submitted by Payton and find that Exhibits P-10 and P-16 show very clearly that the broken pavement lies between the street and what appears to be a parking lot, and comprehends the street and sidewalk area. This assignment of error is without merit.
SECOND ASSIGNMENT OF ERROR: Whether the trial court erred in finding that the area where plaintiff was allegedly injured posed an unreasonable risk of harm.
The City correctly notes that it is not liable for every defect or irregularity in a sidewalk, but only for the dangerous defect that creates an unreasonable risk of injury to persons exercising ordinary care and prudence. Carr v. City of Covington, 481 So.2d 631 (La.1986). However, our review of the evidence, particularly the photographs submitted by Payton, show this sidewalk to be broken and cracked, with grass growing in *451 the cracked area. Unexpected wide cracks, broken off irregular areas at the point where the sidewalk meets the street and obvious irregularities in the surface are features of the entire sidewalk area, from the street to the private property line and from the intersection with the crossing street to well past the point of Payton's injury. Exhibit P-21 shows a crater-like formation created by the loss of the concrete surface of the sidewalk, and in which a veritable lawn is growing. Citizens of a city located in an industrialized nation in the last quarter of the twentieth century should not have to negotiate such a sidewalk at their peril. The condition is obviously a dangerous defect posing an unreasonable risk of harm to pedestrians in Payton's position. This assignment of error is without merit.
THIRD ASSIGNMENT OF ERROR: Whether the trial court erred in assessing plaintiff's percentage of fault.
The Louisiana Supreme Court stated the standard for determining parties' comparative fault:
In assessing the negligent conduct of the parties, various factors may influence the degree of fault assigned to each:
[1] Whether the conduct resulted from inadvertence or involved an awareness of the danger,
[2] How great a risk was created by the conduct,
[3] The significance of what was sought by the conduct,
[4] The capacities of the actor, whether superior or inferior, and
[5] Any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985).
Faucheaux v. Terrebonne Consol. Government, 615 So.2d 289, 294 (La.1993).
The standard of review of a trial court's comparative negligence finding was recently stated by the court:
Regarding the allocation of fault in this circumstance, we adopt the standard set forth in Coco v. Winston Industries, Inc., 341 So.2d [332] at 335 [(La.1976)]. Just like in the quantum area, there is for sure a large amount of uncertainty in the allocation of fault. Our Coco decision pointed out that "The ultimate determination by an appellate court as to whether a given judge or jury abused their `much discretion' as a matter of law is a judgment call." 341 So.2d at 335.
The Court in Coco held that "[o]nly after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court." 341 So.2d at 335. "It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence." Id.... [T]here is an analogy between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations. In both, the trier of fact, unlike the appellate court has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence. Accordingly, we will apply the standard enunciated above in reallocating fault. After the court of appeal finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's decision.
Clement v. Frey, 95-1119 (La. 1/16/96), 666 So.2d 607, 609-11.
Before any adjustment may be made, this Court must find that the trier of fact abused its discretion and that the allocation was clearly wrong/manifestly erroneous.
The record supports the trial court's finding that Payton contributed 33 percent to her slip and fall. She testified that she was familiar with the general area where she fell, but that she had not seen the broken pavement on any previous occasions. She testified that grass obstructed a clear view of the *452 defective sidewalk and that she was on an errand to obtain material necessary for a surgery that was then in progress. However, mindful of a pedestrian's duty to see what she should see, and of the fact that she was in the process of crossing the street at a position not within the pedestrian crosswalk or at the corner, the trial judge attributed nearly a third of the liability for her fall to Payton herself. We find no manifest error or abuse of discretion in this allocation.
FOURTH ASSIGNMENT OF ERROR: Whether the trial court's award of damages is excessive.
Our initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993) cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d at 1261.
The award of $100,000 in general damages is not obviously the result of passion or prejudice, and bears a reasonable relationship to the elements of the proved damages. Many rational triers of fact could have decided that a lower award or a higher award would have been more appropriate, but we cannot conclude from the entirety of the evidence viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." Id., quoting from Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987).
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991).
We find that the record adequately supports the award of general damages. The trial judge found Payton to be a believable witness, and we find nothing in the record to show that he abused his discretion in making that credibility determination. See, Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). Payton was a happily married mother of two young children at the time of her injury, when she was in her early thirties. She participated in various activities with her children and had a rewarding relationship with her husband. She was successfully pursuing the career in health services for which she had prepared herself by education and experience, and for which the vocational evaluation found she was well suited by interest and academic ability. After the injury, she was unable to pursue her hobbies, to play actively with her children or to continue to work. She testified that emotional and sexual aspects of her marriage likewise deteriorated. She continues to have pain and swelling, and the medical experts testified that her condition is not expected to improve with time or further surgery. The award is clearly not overly generous under these facts. We find no error in the trial court's award of general damages.
*453 FIFTH ASSIGNMENT OF ERROR: Whether the trial court's award of future lost wages is excessive.
In making its argument that the record does not support the trial court's award of lost wages, the City relies on evidence excluded from the record in the trial court. The City offers no basis for the admissibility of this evidence, and does not assign as error the trial court's refusal to allow it to be admitted into evidence. This assignment of error is without merit.

APPELLEE'S ARGUMENT IN BRIEF CONCERNING COMPARATIVE FAULT
In brief, Payton argues that the trial court erred in having assigned to her 33% comparative fault. We do not find that Payton filed an Answer to the Appeal in the record. Therefore, we will not consider this argument. La.C.C.P. art. 2133; Matthews v. Consolidated Companies, Inc., 95-1925 (La.12/8/95), 664 So.2d 1191.

CONCLUSION AND DECREE
We find the record supports the judgment of the trial court and affirm the judgment in all respects.
AFFIRMED.
SCHOTT, C.J., dissents.
SCHOTT, Chief Judge, dissenting:
The photographs and testimony show that the place where plaintiff fell was not on the sidewalk, but was located at the edge of the street on an incline toward the sidewalk. Plaintiff intended to jaywalk having stepped off the sidewalk near the middle of the block and she was about to enter the street when she stepped into this grassy area of broken concrete. Consequently, this is not the case of a pedestrian who steps into a trap on a sidewalk. Rather it is that of a pedestrian who left the safety of a sidewalk to cross the street in the wrong place. The City owed no duty to plaintiff to repair this defect because it was not located in an area where she was supposed to be walking. This is simply not the case of a citizen becoming the victim of a defective sidewalk. It is that of this plaintiff who fell while walking in an area which the City had no duty to maintain for the benefit of pedestrians.
In his reasons for judgment the trial judge apparently recognized the need to place some special duty on the City in order to support the conclusion that the City was liable to the plaintiff. The trial judge found that the City owed a special duty to all pedestrians including jaywalkers like the plaintiff because there were a number of hospitals in this area with the result that emergency personnel would be rushing about from one hospital to another. The trial court found that these circumstances provided an exemption to plaintiff from the ordinary rules applicable to a jaywalker. With all due respect I submit that neither the law nor the facts of this case support the conclusion that the City had extraordinary maintenance duties in this area of the City because hospitals were located there. Furthermore, the record does not show the plaintiff was responding to an emergency when she fell.
The fact that this defect was not on the sidewalk, but was in a place where pedestrians were not expected or supposed to be walking, prevents the conclusion that it constituted unreasonable risk of harm. Only plaintiff's conduct was unreasonable.
As I view the photographs the place where plaintiff fell was perfectly obvious. It was neither a trap nor a hidden defect. In fact there were yellow paint lines and stripes between the sidewalk and the hole which served as a kind of beacon for her to be careful. Had plaintiff exercised even the slightest degree of ordinary care she would have seen it. In his reasons for assigning comparative fault of thirty-three percent to plaintiff the trial judge observed that "nothing can relieve us of at least a portion of the burden to look where we are going and to see what should have been seen." I agree with this statement completely, but I submit with all due respect that there is a contradiction between that statement and the finding of any liability on the part of the City. If this was a defect or hazard that should have been seen the defect could not be an unreasonable risk of harm. Instead it was an obvious obstacle to be avoided and plaintiff's conduct *454 was the same as if she walked into a street sign or a stop sign or a fire hydrant.
I would reverse the judgment of the trial court and dismiss plaintiff's suit.
NOTES
[1] Dr. Brunet's medical report clinical notes first mention a back problem on 22 September 1986. Payton testified, however, that she complained to Dr. Haddad of burning in her back on the day of the accident.