897 So.2d 790 (2005)
Penny Ann CASBON
v.
William B. PHILLIPS.
No. 2004-CA-1717.
Court of Appeal of Louisiana, Fourth Circuit.
February 16, 2005.
*791 Richard Ducote, Richard Ducote & Associates, P.L.C., New Orleans, LA, for Plaintiff/Appellee.
Michael D. Clement, Law Office Of Michael D. Clement, Belle Chase, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge EDWIN A. LOMBARD and Judge LEON A. CANNIZZARO JR.).
JOAN BERNARD ARMSTRONG, Chief Judge.
Penny Ann Casbon sued William B. Phillips for damages allegedly sustained as a result of a battery. Mr. Phillips answered, alleging that Ms. Casbon's attack against him caused her injuries and reconvened for his own damages arising from the altercation.
Following a bench trial, Judge C. Hunter King entered judgment on July 2, 2003 in favor of Ms. Casbon for medical expenses in the amount of $895, for lost wages in the amount of $1,700; and for general damages in the amount of $17,500. The judgment assessed court costs, a $750 expert fee and judicial interest from the date of judicial demand against Mr. Phillips. The judgment also dismissed Mr. Phillips' reconventional demand for lack of supporting evidence. Judge Sheryl Howard succeeded Judge King and denied Mr. Phillips' motion for new trial on April 1, 2004.
Mr. Phillips appealed, but does not contest the trial court's judgment finding liability on his part and dismissing his reconventional demand. He assigns only one error, that is, that the damage award is excessive and constitutes an abuse of the trial court's discretion.
Ms. Casbon testified that she was forty-one years old at the time of the trial, and worked as a certified nurse's assistant, sitting with elderly and handicapped patients in their homes. She testified that she has known Mr. Phillips since 1992 and that they had been in an intimate relationship at the time of the battery. She testified that she and Mr. Phillips are also second cousins.
She testified that on April 21, 1996, while walking with Mr. Phillips, without warning he started to beat her, choking her, kicking her and throwing rocks and sand at her as she lay on the ground. He then abandoned her as she lay on the ground and returned to his home. She testified to "blood all over" and that she was suffering extreme pain. She testified that it was hard to breathe and her face was burning. She thought she passed out for a while during the beating.
A Plaquemines Parish deputy sheriff took her to Plaquemines Parish Comprehensive Care Hospital in Port Sulphur where she stayed for a few hours. She *792 was released with the instruction to apply ice packs to affected areas, keep head elevated and follow up with a private doctor as needed. She received and introduced into evidence a note on prescription paper that said, "Please excuse from work 4/22/96-4/24/96." The next day she saw a chiropractor, Timothy J. Kern, D.C.
According to Dr. Kern's report of July 3, 1996, his diagnosis when he was first consulted on April 22, 1996 was cervicalgia, back contusion, head, face and neck contusions, thoracic myalgia and lumalgia. He attributed these conditions solely to the battery. He recommended conservative treatment from four to six weeks including joint mobilization, electrical stimulation, cryo and hydroc packs, deep goading massage, myofacial release and such other physical modalities that may be warranted by Ms. Casbon's response to treatment.
In his discharge summary dated May 6, 1997, Dr. Kern notes that the clinical course of therapies utilized in his office was designed to reduce spasm of musculature, to reduce tension on the injured connective tissues and to promote healing of the damaged tissues. He recorded that Ms. Casbon voluntarily suspended treatment on November 11, 1996, whereupon he closed her file and removed himself from her care due to noncompliance of his prescribed treatment. He attached his bill in the amount of $895.00.
The record also contains documentation of Ms. Casbon's voluntary admission on May 3, 1996 to the Methodist Behavioral Resources Pavillion[1] where she was diagnosed with post-traumatic stress disorder and early onset major depression resulting from the battery. She reported inability to sleep or eat, poor concentration, inability to drive, crying, memory problems and flashbacks to the beating episode. She also reported some suicidal thoughts and a feeling of being overwhelmed, and an inability to care for herself and her daughter or to perform household chores or her job. She was treated for her psychological trauma and followed medically. Her mental status improved and, by May 11, 1996, her treating physician found that she had reached maximum inpatient benefit. She was discharged on May 11, 1996 to the care of her family with medical advice. She was also to be followed by her local mental health clinic for management of her medication, Wellbutrin. This timeline is consistent with Ms. Casbon's testimony that she missed twenty-one days of work.
Ms. Casbon testified that she has never been able mentally to process how someone she had known for years and dated intimately could have turned on her without provocation and beaten her so badly. The beating also made her realize that Mr. Phillips did not love her.
The bruises on her back lasted a long time, and the pain and difficulty in breathing lasted for about six months. She also testified to feeling ashamed and stupid as a result of the beating. Even a year after the incident the bruises on Ms. Casbon's neck were sufficiently evident that a person she met in a bakery asked if she had been attacked by a vampire. The photographs taken in October of 1996, some six months after the beating, and introduced into evidence supported her description of severe facial and neck bruising and deep bruising of her shoulders, upper arms and chest. Ms. Casbon testified that the bruises lasted for about two years. She *793 saw a doctor who prescribed Retin-A and creams to try to lighten the bruises.
Ms. Casbon testified that she missed twenty-one days of work at Sears on Michoud Boulevard where she was earning ten dollars an hour and working at least eight hours a day. She estimated her lost income to be $1,700.
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
The award of general damages in this case is not obviously the result of passion or prejudice, and bears a reasonable relationship to the elements of the proved special damages. Many rational triers of fact could have decided that a lower or even a higher award would be more appropriate, but we cannot conclude from the entirety of the evidence viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987); Youn v. Maritime Overseas Corp., supra.
Reversal of a general damage award requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991).
Applying that standard, it is clear that the evidence of record supports the general damage award, which is reasonable and does not "shock the conscience." Even if we were to ignore the nine days of in-patient psychiatric care that Ms. Casbon sought and received within a month of her brutal beating, her pain, suffering and humiliation at the hands of a person whom she loved and who she believed loved her, together with the seven months of chiropractic treatment would justify this general damage award.
The award of $1,700 in lost wages requires additional analysis. In order to prove entitlement to lost wages, a plaintiff bears the burden of proving that he would have been earning wages but for the incident in question. Dumas v. City of New Orleans, XXXX-XXXX, p. 10 (La.App. 4 Cir. 12/5/01), 803 So.2d 1001, 1007. In that case, the court accepted the plaintiff's testimony that she took early retirement from her job as a high school principal as a result of the incident complained of, and that she would probably have been promoted had she not retired. This is consistent with the principle that a claim for lost wages need not be proven with mathematical certainty. It requires only such proof as reasonably establishes the claim, and this proof may consist of the plaintiff's own testimony. McDonough v. Royal Sonesta, Inc., 626 So.2d 438, 440 (La.App. 4 Cir.1993). In that case, we rejected the attorney *794 plaintiff's testimony as insufficient because the income from her law firm was based on fees and retainers from clients, and her testimony as to the "potential clients" she lost was deemed too speculative. In the instant case, Ms. Casbon was an hourly employee, whose lost wages could be calculated reasonably based on her testimony as to the number of days' work she missed. The speculative element present in the McDonough case are absent in the case at bar.
In Sherlock v. Berry, 487 So.2d 555, 557 (La.App. 4 Cir.1986), we accepted the plaintiff's testimony establishing his income in 1983 and in 1984, and relating the negative difference between the two to missed work. In that case, we affirmed the award for lost wages, noting that while the defendants tried to show that there were other reasons for the lost time, the trial court evidently believed the accident and resultant injury caused the loss, which this Court found credible.
In Woolfarth v. City of New Orleans, 572 So.2d 1194 (La.App. 4 Cir.1990), we affirmed the trial court's rejection of the testimony of a self-employed horse trainer as to lost wages where he was unable to produce any proof of lost wages. In that case, as in McDonough, the plaintiff was unable to testify as to a specific amount of wages lost for a specific length of time.
Another case in which we deemed the plaintiff's testimony as to lost wages to have been too speculative is Hicks v. Barney, 526 So.2d 391 (La.App. 4 Cir.1988). In that case, we reversed an award of $9,250 for lost income where the plaintiff testified that he had not held a job for several months prior to his accident. He claimed to have had a job offer and testified that he lost the possibility of the job because of the accident and was unable to secure another job for more than a year. He produced no evidence of the job offer and claimed that his prospective employer had died before the trial. The plaintiff testified he would have earned $250 per month and the trial court awarded him $250 per week. We held that the plaintiff did not sustain his burden of proving lost wages with his highly speculative testimony.
In the instant case, we are presented with the uncontroverted testimony of Ms. Casbon that she was employed by Sears on Michoud Boulevard at a salary of $10 per hour, that she worked at least eight hours each workday, that she missed twenty-one days of work and lost $1,700 in earnings. This period of time is substantiated by the record evidence of her hospitalizations and discharge to the care of her family. We do not find her testimony to be of the speculative nature this Court rejected in the aforementioned cases.
For the foregoing reasons, and having considered and reviewed the entire record as a whole, we find no manifest error or abuse of discretion in the judgment of the trial court. Therefore, we affirm the judgment.
AFFIRMED.
NOTES
[1] It is unclear whether these reports were formally introduced into evidence. Mr. Phillips' counsel in brief indicates that they were offered in the record but not formally introduced into evidence. The records were placed in the evidence envelope by the trial court and sent to the Court of Appeal as a part of the record.