463 So.2d 639 (1984)
Charles J. MALBROUGH
v.
Dr. R. Vaclav HAMSA and his insurer XYZ Insurance Company and Dr. John Schumacher and his insurer ABC Insurance Company.
No. 84-CA-391.
Court of Appeal of Louisiana, Fifth Circuit.
December 11, 1984.
Dissenting Opinion January 9, 1985.
Rehearing Denied February 20, 1985.
Writs Denied April 1, 1985.
*640 Allan Berger and John A. Occhipinti, New Orleans, for plaintiff-appellee.
Lemle, Kelleher, Kohlmeyer, Hunley, Moss & Frilot Paul B. Deal and Darryl J. Foster, New Orleans, for R. Vaclav Hamsa, M.D., defendant-appellant.
Adams & Reese, Harold A. Thomas, New Orleans, for John F. Schumacher, M.D., defendant-appellant.
Brough & Livaccari, Anthony J. Livaccari, Jr., New Orleans, for Employers Fire Ins. Co., intervenor-appellee.
Before CHEHARDY, BOWES and GAUDIN, JJ.
CHEHARDY, Judge.
In this medical malpractice suit, liability and damages have been bifurcated. The case was tried on liability only and the district court found the defendant physicians to have been negligent in the surgery performed on the plaintiff. The defendants have appealed.

*641 FACTS
Charles H. Malbrough underwent lumbar laminectomy surgery performed by Dr. John F. Schumacher, a neurosurgeon, and Dr. R. Vaclav Hamsa, an orthopedic surgeon, on July 14, 1977. The operation consisted of a decompressive laminectomy at L3-L4 and removal of a ruptured disc at L4-L5. The surgery was complicated by the presence of arachnoiditis (inflammation of the membrane surrounding the nerve roots), the result of scarring from 1968 surgery involving a partial hemilaminectomy of L4 bilaterally and a partial hemilaminectomy of L5 on the right with removal of the L4 disc bilaterally.
(We note we have taken the descriptions of both the 1968 and the 1977 operations from the surgeons' operative reports. Both reports state the L4 disc was removed. Drs. Hamsa's and Schumacher's operative reports of the plaintiff state he had undergone a prior laminectomy at L5 and S1, which does not appear in the records of the 1968 surgery. These apparent discrepancies are not explained in the record.)
Following the operation, Mr. Malbrough began to have difficulty controlling his bowel and bladder functions, as well as sexual impotence and occasional weakness in his legs. Mr. Malbrough's problems continued despite his follow-up visits to Dr. Hamsa for approximately six weeks postsurgery and to Dr. Schumacher for approximately ten months post-surgery. Eventually he sought treatment from other physicians, at which time he learned that his bowel, bladder and impotence problems are permanent and probably resulted from damage to the nerves during the 1977 operation.

ACTION OF THE TRIAL COURT
Mr. Malbrough filed suit against Drs. Schumacher and Hamsa on September 19, 1979. (At the time neither physician was a health care provider qualified for limitation of liability under LSA-R.S. 40:1299.41 et seq., the Medical Malpractice Act. Accordingly, plaintiff was not required to submit his claim to a medical review panel before filing suit.)
The district court found Drs. Schumacher and Hamsa liable for malpractice, assigning extensive written reasons. The court found that Drs. Hamsa and Schumacher failed to use reasonable care and skill during the operation or good judgment in the application of their skill and that plaintiff's injuries were a proximate result of these failures. He concluded that excessive retraction of the nerve root and failure to do a wide lateral laminectomy were the cause of plaintiff's bowel, bladder and impotence problems. Because the surgeons knew of plaintiff's previous back surgery and that severe arachnoiditis existed, the court stated, they should have planned or effected the operation in such a way that retraction was minimal.
The judge was impressed by the testimony of the plaintiff's experts, Dr. Jacques Schaerer and Dr. Roy Selby. He concluded from their testimony that "it would be inexcusable and unnecessary to apply excessive retraction to the nerve root." He discounted the testimony of Drs. Schumacher and Hamsa that a wide laminectomy was performed, because Drs. Selby and Schaerer each stated the laminectomy could have been wider, and even one of the defendants' experts, Dr. Michael Carey, testified they could have gone wider.
Finally, the judge concluded, the procedure performed by the defendants was not adequate and fell below acceptable medical standards. He further found that "the doctors lacked the degree of skill required because part of a surgeon's skill is to be able to retract without causing nerve damage."

ISSUES
On appeal, Dr. Schumacher raises the following issues:
1. Whether plaintiff proved by a preponderance of the evidence that Dr. Schumacher lacked the degree of knowledge or skill ordinarily practiced by physicians within the specialty of neurosurgery;
*642 2. Whether plaintiff proved that Dr. Schumacher failed to use reasonable care and diligence along with his best judgment in the application of that skill;
3. Whether the trial court correctly admitted into evidence X rays taken by Dr. R.C. Llewellyn several years after the surgery;
4. Whether the trial court allowed the existence of a bad result to influence its finding on the question of evidence; and
5. Whether plaintiff's claim had prescribed under LSA-R.S. 9:5628.
The issues contested by Dr. Hamsa are as follows:
1. Whether the surgery was negligently performed;
2. If so, whether Dr. Hamsa, as the assistant surgeon, was individually negligent;
3. If he was not individually negligent, whether as an assistant surgeon he can be liable for the negligent choice of or performance of surgery by the operating neurosurgeon; and
4. Whether plaintiff's claim against Dr. Hamsa had prescribed.

PRESCRIPTION
The defendants and their insurers filed exceptions on the ground of prescription in the district court, which were denied. They reiterate the exception on appeal. The chronology listed in their briefs to this court illustrates that plaintiff filed suit more than two years and two months after the surgery, more than two years after his last visit with Dr. Hamsa, and more than one year and two months after his last visit with Dr. Schumacher.
LSA-R.S. 9:5628 mandates that a malpractice suit be brought within one year of the date of the alleged act of negligence or, in the alternative, within one year of the discovery of said negligence, but in no event later than three years after the alleged act of negligence. Plaintiff contends his suit was filed within one year of his discovery of the alleged negligence.
At trial Mr. Malbrough testified he did not learn that his bowel, bladder and impotence problems were permanent until after his attorney received a copy of a report by Dr. Pierre Espenan, who had examined and tested plaintiff on December 5, 1978. Dr. Espenan's report was issued on December 12, 1978. We find the following comments from that report significant:
"He has been seen by an orthopedic surgeon, by a neurosurgeon and by a urologist. Either all or one has informed him that it might get better.
* * * * * *
"He has not seen a neurosurgeon or any other doctors besides the ones who have been taking care of him through this disc operation.
* * * * * *
"I believe that this patient should have a complete and thorough neurological examination by someone who would render you an impartial and unbiased opinion. * * *
"I think that the prognosis is very poor for this patient to get return of his sphincter function or his bladder control. It probably is associated with sectioning of the nerve to these areas. He denies any previous difficulty in these areas and it wasn't until after the surgery that he developed these problems."
The defendants argue plaintiff should have been aware of possible negligence either from the time his post-surgical symptoms developed, or at the latest some time before September 19,1978, because by that date Mr. Malbrough had been seen by Dr. Hamsa twice and by Dr. Schumacher ten times. They argue that surely by that time Mr. Malbrough should have had sufficient command of the operative facts to create a suspicion of negligence.
We disagree. Mr. Malbrough testified that Dr. Schumacher indicated to him after surgery that he would heal but that it would take time. Dr. Hamsa apparently made no statement one way or the other respecting the plaintiff's subsidiary problems. It was only after receiving Dr. Espenan's *643 report in December 1978 that Mr. Malbrough realized his problems would never be resolved because they were the result of permanent nerve damage. His suit was filed within one year of learning that. Accordingly, his cause of action has not prescribed. Young v. Clement, 367 So.2d 828 (La.1979); Henson v. St. Paul Fire & Marine Ins. Co., 363 So.2d 711 (La.1978); Zeno v. Lincoln General Hospital, 376 So.2d 1284 (La.App. 2d Cir.1979).

LIABILITY OF DR. SCHUMACHER
The burden of proof in medical malpractice cases is statutorily established:
"A. In a malpractice action based on the negligence of a physician * * *, the plaintiff shall have the burden of proving:
"(1) [W]here the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians * * * within the involved medical specialty.
"(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
"(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
* * * * * *
"C. In medical malpractice actions * * * the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician * * *. [I]njury alone does not raise a presumption of the physician's * * * negligence. * * *" LSA-R.S. 9:2794.
At trial, the consensus of expert opinion was that Mr. Malbrough's problems result from damage to the sacral nerves during the 1977 surgery, probably due to excessive retraction of the dural sac containing these nerves. As mentioned above, the nerve roots in the area were severely scarred from prior surgery on the plaintiff's back. As a result, the nerve roots adhered together rather than gliding against each other like healthy nerve roots, and were much more sensitive to pressure. The physical problems the plaintiff suffers are collectively known as cauda equinal syndrome, because the portion of the spinal cord that was damaged is called the cauda equina.
Dr. Schumacher described the procedure he used in performing the surgery as a posterior wide lateral approach. He made an incision in the back over the area of the suspected blockage and made a hole or window in the vertebra so as to see the disc, cutting through the posterior longitudinal ligament as he did so.
Because the spinal cord and vertebral bodies overlie the discs, he had to curette the disc out from each side. To get to it without damaging the spinal cord, it was necessary to retract the nerve sac, first to one side and then to the other, as he curetted from each side. In his operative report Dr. Schumacher stated the dural sac was "gently" retracted. Both Dr. Schumacher and Dr. Hamsa testified they were well aware of the plaintiff's severe arachnoiditis and planned the surgery taking that condition into account.
The plaintiff's neurosurgery experts, Dr. Schaerer and Dr. Selby, testified that Dr. Schumacher should have been aware that the arachnoiditis on the dural sac made the nerves more sensitive and therefore he should have avoided retracting the nerve sac. They stated he could have done so either by making a wider lateral approach (a wider window in the vertebra) or by using an anterior extra-peritoneal approach (coming from the front). Both the wider lateral approach and the extra-peritoneal approach would probably have made a spinal fusion necessary in addition to the laminectomy, but would have avoided retraction of the dura. Both doctors opined that Dr. Schumacher had not met the requisite standard *644 of care in view of the fact that nerve damage did occur to the patient.
Regarding the description in the operative report of the dural retraction, Dr. Schaerer testified,
"The statement that the dura was gently retracted, under those circumstances I think it must be considered a self-serving statement refuted by the result."
In Dr. Schaerer's opinion, it is part of the surgeon's skill to be able to retract a nerve without causing nerve damage.
Dr. Selby testified that neurologists measure the amount of retraction on the dura through their training and experience; they are taught how to approach brain tissue or any body tissue and its tolerance for traction or retraction. Asked whether the extent of retraction is not a matter of clinical judgment on the surgeon's part, he said, "Well, if you are applying force against the dura you are retracting too much." He admitted the operating surgeon ought to be in the best position to judge which method to use, but said, "It would depend upon the outcome."
Dr. Selby admitted he was judging Dr. Schumacher's standards in this operation by the result of the surgery. In his opinion, too much retraction was placed against the dural sac containing the cauda equina, producing cauda equinal syndrome. Further, Dr. Selby stated, Dr. Schumacher apparently became aware of the problems about five days after the surgery but carried out no investigation to determine if the neurological damage was reversible. Dr. Selby felt that omission was an important factor.
Both Dr. Schaerer and Dr. Selby stated it was unnecessary to have made an incision in the posterior longitudinal ligament, because that required further retraction on the nerve roots.
The defendants' experts in neurosurgery, Dr. Richard Warren Levy and Dr. Michael Carey, testified on the other hand that the approach Dr. Schumacher used was within the prescribed standard of care. Judging from his operative report, they concluded he had used his best medical judgment at the time in deciding how wide a window to cut in the vertebra, and they found nothing to indicate a lack of care in his handling of the dural sac. They both stated that going wider laterally or using a extra-peritoneal approach would have required a fusion to stabilize the patient's back, and such additional surgery should be avoided when possible.
Dr. Richard Levy testified as an expert neurologist on behalf of Dr. Schumacher. He stated he would never have gone wider in the laminectomy than was done in this case, because it would have destabilized the patient's back, requiring a fusion. He said it was proper for Dr. Schumacher to cut through the posterior longitudinal ligament because there is no other way to get to the ruptured disc.
Based on what is described in the operative note, it was his opinion the operation was within the standards of care for neurosurgeons. He said the risk of nerve damage where there is pre-existing severe scarring, as here, is present no matter how careful the neurosurgeon. His presumption from reading the operative note was that the bony exposure was adequate and the retraction of the dura was standard. He said if his presumptions were correct then the surgery was performed within the requisite standard of care. He stated he had performed re-operations in which he found dense scarring, but had never had a patient end up with permanent bowel, bladder and impotence problems. However, he said, these are a recognized complication of a re-operation.
Dr. Carey also testified on Dr. Schumacher's behalf as an expert in neurosurgery. He admitted it was probably true the plaintiff's sacral nerves were damaged during the 1977 surgery. In his opinion, however, Mr. Malbrough's problems were not caused by negligence because when one is operating on the nervous system it is possible to have it malfunction, particularly if it is compromised by arachnoiditis.
Dr. Carey said he could state no specific maneuver during the operation to account *645 for the nerve damage. He admitted he had stated in a pretrial deposition that he was sure it was the manipulation of the dura that caused the neurologic loss, but said his opinion had changed since giving the deposition. He felt it was strictly conjecture to say whether retracting the nerve root caused the trouble. He found no evidence that what was done was in any way incorrect or improper.
He stated further it would be possible to go very far laterally to avoid retraction, but it is a matter of "at-the-table" judgment by the surgeon. A more lateral exposure is an inherently destabilizing procedure that may lead to a lot of subsequent back discomfort because a fusion would be necessary. He said one cannot determine these things objectively before surgery; the question is whether the surgeon at the time felt he should have done it based on his experience"a judgment call at the time the back is open."
It was also Dr. Carey's opinion that the posterior longitudinal ligament must be cut in order to take out the disc. In addition, he said even if Dr. Schumacher had gone further out laterally he might still have had to manipulate the nerve root to free it up from the pre-existing scar.
All the experts agreed that cauda equinal syndrome is a known complication of laminectomies, but occurs only rarely. It is more likely to occur in re-operations than in a first operation, but still is unusual. None of the surgeons who testified had ever had this problem occur following a surgery he performed.
Dr. Schumacher contends that the expert opinions presented by the plaintiff accusing him of negligence are based on hindsight, not taking into consideration the fact that during the course of an operation a surgeon must make many ad hoc decisions. He argues he had "very few choices: he could have done as he did and gently retract the dura, or he could risk removing more bone and thereby destabilize the plaintiff's spine which would then involve a fusion." Because a fusion would have prolonged the surgery and involved additional risks, as well as the possibility of pain and discomfort, Dr. Schumacher asserts he acted prudently and used his best judgment.
The respective weight to be accorded expert testimony, and the factual conclusions regarding negligence to be drawn therefrom, are functions of the trier of fact. Absent a showing of manifest error, these conclusions may not be reversed on appeal. Canter v. Koehring Co., 283 So.2d 716 (La.1973). We do not find the district court's credibility evaluations and inferences of fact unreasonable, nor are they clearly wrong. Accordingly, we affirm the findings of liability on the part of Dr. Schumacher.
A subsidiary issue raised by Dr. Schumacher is whether the trial court erred in admitting into evidence certain X rays on which Dr. Selby based his ultimate conclusion that more bone could have been removed. Defendants object it was prejudicial to allow into evidence X rays that may or may not accurately depict the condition of the plaintiff's spine at the time of surgery.
We find no error in the use of the X rays. There was no testimony to indicate there had been any significant internal changes at the surgical site. If Dr. Schumacher had felt the X rays distorted the surgical site as he had viewed it at the time of surgery, he could have testified to that effect. Further, Dr. Schumacher himself testified he could have removed more bone than he did, but chose not to do so because he wished to avoid the necessity for a fusion.
Finally, Dr. Schumacher argues the trial judge committed manifest error because he allowed the existence of a bad result to raise a presumption of negligence. Appellant contends the court erred by failing to judge the defendants' conduct by what they knew or should have known at the time of the surgery.
We disagree. There is no indication from the trial judge's reasons for judgment that he placed undue emphasis on the unfortunate results of the surgery. He made *646 clear that, given the defendants' knowledge of the plaintiff's severe arachnoiditis, in his opinion they failed to use their best medical judgment in planning the surgery so as to avoid damaging the already-scarred nerves.

LIABILITY OF DR. HAMSA
Dr. Hamsa contends, first, the surgery was not negligently performed. Secondly, he asserts that, regardless of the liability of Dr. Schumacher, he is not liable to plaintiff because (1) he is an orthopedic surgeon, not a neurosurgeon; and (2) he served as Dr. Schumacher's operating assistant during the procedure and did not himself perform the surgery. He argues that the plaintiff failed to satisfy the statutory burden of proof under R.S. 9:2794 as to the degree of care required of an orthopedic surgeon serving as a surgical assistant.
It should be noted that Mr. Malbrough was being treated by Dr. Hamsa for his back pain prior to the operation. When Mr. Malbrough was admitted to the hospital for an acute episode and underwent a myelogram showing a blockage at L3-L4, Dr. Hamsa diagnosed a herniated L4-L5 disc. Because of the complicating arachnoiditis Dr. Hamsa had the patient seen in consultation by Dr. Schumacher, the neurosurgeon. The doctors discussed the case at great length and scheduled the patient for surgery.
During the surgery Dr. Hamsa assisted Dr. Schumacher; according to Dr. Hamsa, he simply did whatever Dr. Schumacher requested of him. He contends it was incumbent on the plaintiff to establish the duties or degree of care required of an orthopedic surgeon who serves as a surgical assistant, but all plaintiff's evidence was directed toward the degree of care required of one who performs a laminectomy under the complications involved in Mr. Malbrough's case. None of this evidence, argues Dr. Hamsa, establishes the degree of care required of an assistant surgeon. Accordingly, he asserts, plaintiff's case against him should have been dismissed.
Instead, the trial judge held Dr. Hamsa jointly liable with Dr. Schumacher:
"The Court finds that both Dr. Schumacher and Dr. Hamsa consulted and agreed to what surgical procedure would be performed and that both doctors retracted the nerve root during the operation. The Court finds that excessive retraction of the nerve root and the failure to do a wide lateral laminectomy were the cause of the plaintiff's bowel, bladder and impotence problems."
Clearly, the trial judge concluded that Dr. Hamsa not only assisted but actually participated in performance of the surgery. This is supported by the record. Dr. Russell Levy, who testified as an expert orthopedic surgeon on behalf of Dr. Hamsa, described the role of an orthopedist in assisting a neurosurgeon in lumbar laminectomy surgery:
"The orthopedists in these cases usually render an opinion, and they're usually the ones responsible for holding the nerve root retractors once the nerves are freed up. So they more or less hold the retraction to allow visualization once the disc is being removed in the lower part of the wound."
Although Dr. Hamsa denied at trial that he had helped curette the disc material, stating he only took the material off the curette, his deposition testimony was that he had helped to curette out the disc. Further, Dr. Russell Levy testified, "My understanding is that he did help curette the disc. But I don't recall that it was reflected in the record that way. It was my understanding that he did do some of the curetting."
In addition, Dr. Selby testified that the techniques used by both neurosurgeons and orthopedic surgeons in performing laminectomies are no different insofar as their specialties are concerned. Dr. Russell Levy testified that in New Orleans both orthopedists and neurosurgeons do lumbar and cervical disc surgery: "The training in both the medical schools have been for the two different services during residency to compete more or less for this *647 type of surgery. So both orthopedists and neurosurgeons are trained to do this."
Taken as a whole, we find plaintiff carried his burden of proof that Dr. Hamsa participated in planning and performing the surgery to such an extent as to be liable for its results. Further, the evidence establishes that the standard of care for Dr. Hamsa was the same as for Dr. Schumacher, insofar as this particular type of surgery is concerned.
In addition, as mentioned above, Dr. Selby pointed out that neither Dr. Schumacher nor Dr. Hamsa ever mentioned to plaintiff that his problems may have been caused by nerve damage sustained during the operation. Nor did either of them take immediate or early action to determine whether there was nerve damage and whether the effects were reversible. Like Dr. Selby, we find this omission an important factor.
Considering all the testimony and evidence we do not find the trial judge was manifestly erroneous or clearly wrong in concluding that Drs. Hamsa and Schumacher were negligent and responsible for the injuries suffered by plaintiff. Accordingly, the judgment of the district court finding the defendants liable to the plaintiff is affirmed. The case is remanded to the district court for trial on the issue of damages. Costs of this appeal are assessed against defendants-appellants.
AFFIRMED AND REMANDED.
GAUDIN, J., dissents and assigns reasons.
GAUDIN, Judge, dissenting.
I respectfully dissent, being of the opinion that the testimony and evidence preponderated in favor of the defendant physicians, Drs. John Schumacher and Vaclav Hamsa, and that the trial judge was manifestly wrong in finding otherwise.
Dr. Schumacher is a neurosurgeon while Dr. Hamsa is an orthopedist. Dr. Schumacher, with Dr. Hamsa assisting, performed a delicate decompression laminectomy on Charles Malbrough and removed a herniated disc. This was at precisely the same spot where previous surgery had been performed, leaving Mr. Malbrough with severe arachnoiditis and scarring going into the July 14, 1977 operation.
Although the bulging disc was excised, the record supports the trial judge's determination that Mr. Malbrough's present urological problems are related to the July 14, 1977 operation.
But were Drs. Schumacher and Hamsa negligent in excessively retracting the nerve roots and in failing to do a wide laminectomy? In so finding, the trial judge accepted the opinions of two neurosurgeons, Dr. Jacques Schaerer from St. Louis, Missouri and Dr. Roy Selby of Lacross, Wisconsin and rejected (1) the testimony of Dr. Schumacher who explained how carefully the sensitive surgery had been performed on a diseased spine, (2) Dr. Hamsa's similar testimony, (3) the testimony of Dr. Richard W. Levy, the chief of neurosurgery at Touro Infirmary, who said that the surgery had been performed within acceptable standards, (4) the testimony of Dr. Russell Levy, an orthopedic surgeon, who said that the surgery was "... performed within the standard of care expected...," and (5) the testimony of Dr. Michael Carey, a neurosurgeon and a professor of neurosurgery at LSU, who said:
"I think it was certainly within the standard of the local and national community. I think it was a good case."
While the record does contain some testimony supportive of the trial judge's decree, a consideration of the entire record and all of the testimony indicates that the finding of negligence was clearly erroneous.