Barbara TROMBLEY and Dale Trombley, Sr., Appellants,

v.

STARR–WOOD CARDIAC GROUP, PC, Doctors Richard A. Anschuetz, Aftab Ahmad, Hazem Barmada, and Harold H. Randecker, Jr., Individually, Appellees.

Nos. S–8780.

Supreme Court of Alaska.

June 16, 2000.

---

**918**

Robert C. Erwin, Law Offices of Robert C. Erwin, and Roberta C. Erwin, Wade & De Young, Anchorage, for Appellants.

Matthew K. Peterson, Thomas V. Van Flein, Clapp, Peterson & Stowers, LLC, Anchorage, for Appellees Starr–Wood Cardiac Group and Dr. Ahmad.

John M. Conway, Jerome H. Juday, Atkinson, Conway & Gagnon, for Appellees Drs. Randecker and Barmada.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

Barbara and Dale Trombley sued Starr–Wood Cardiac Group and its employees Drs. Aftab Ahmad, Hazem Barmada, and Harold Randecker for medical malpractice. The superior court granted summary judgment on all claims in favor of the defendants. We reverse with respect to Barbara Trombley's claims, as there are genuine issues of material fact. But we affirm with respect to Dale Trombley's claim for loss of consortium, as Barbara Trombley was married to another man at the time of the alleged malpractice, and no consortium claim may be maintained under such circumstances.

### II. FACTS AND PROCEDURAL HISTORY

#### A. Facts

In late August or early September 1991, Barbara Trombley (Trombley) began to experience shortness of breath and chest pain.[1]

Her doctor found an arterial blockage and, realizing that she was at risk for a heart attack, scheduled surgery for a few days later. Doctors from the Starr–Wood Cardiac Group were selected to perform the surgery. When Dr. Storm Floten and Dr. Randecker explained to Trombley how the surgery would proceed, she requested that any vein harvested from her leg be taken from her left leg, because she had a prior history of phlebitis (blockage of the veins) in her right leg. Her doctors assured her that they would use a vein from her left leg. The surgery was eventually performed on October 8, 1991, not by Dr. Floten (who was originally scheduled to do it), but by Drs. Ahmad and Barmada, with Dr. Randecker assisting.

A total of three grafts were needed to treat Trombley's heart. Two of the grafts—one used to bypass the right coronary artery and one on the left anterior descending artery—were successful. The third graft, bypassing the first diagonal, which is also known as the ramus intermedius, closed up or failed, if it was bypassed at all. Trombley's expert claims that during this portion of the surgery Dr. Ahmad bypassed an incorrect vessel, a smaller vessel known as the second diagonal. This claim is, in part, difficult to prove given the non-detailed nature of the operative notes.

Also, during the surgery, the vein used for the grafts was harvested from Trombley's right leg, not her left one as she had requested. She was never given an explanation as to why the right leg had been used. The incision was from her knee to her groin, and after surgery the skin was lapped over rather than stitched together. This incision eventually became infected. Trombley underwent plastic surgery to remove dead tissue from the wound and to stitch up the incision.

Trombley did not recover well from her heart surgery. She had trouble breathing and returned to the hospital for a week, where she was diagnosed with an arterial fibrillation problem. She had three angio-

---

**1.** In reviewing the grant of a summary judgment, this court is required to take that view of the facts that most favors the opponent to the mo-

tion. Our recitation of the facts in this opinion is made from that perspective.

plasties between February of 1992 and December of 1994. During this period, she was often tired and suffered from severe chest pains.

### B. Proceedings

Barbara and Dale Trombley filed this medical malpractice suit in October 1993. The defendants filed a motion for partial summary judgment to dismiss Dale Trombley's claim for loss of consortium, since the Trombleys were not married when Barbara's surgery and post-operative care were performed. The trial court granted this motion, finding that Barbara Trombley "was in fact married to Keith Bradrick" on the day the surgery took place.

The defendants filed motions for summary judgment on the remaining claims based primarily on the argument that the plaintiffs' expert testimony had failed to establish negligence. The superior court granted these motions, stating:

> [T]here is no expert testimony on some of the fundamental elements of plaintiffs' claims of medical malpractice . . . .
>
> Although there is expert testimony from Dr. Anastassiou that the defendants' treatment of the plaintiff was negligent or below the acceptable standard of care, he does not testify that the treatment in any way caused the damages for which the plaintiff seeks to recover.

The Trombleys filed a motion to reconsider and the court ordered further briefing. After reviewing this briefing, the court affirmed its previous order and supplemented it with a memorandum of law and facts.

The Trombleys appeal.

### III. DISCUSSION

#### A. Standard of Review

We review grants of summary judgment de novo.[2] "We will uphold summary judgment only if the record presents no genuine issues of material fact and the moving party was entitled to judgment on the law applicable to the established facts."[3] "The proffered evidence is to be viewed in the light most favorable to the party opposing the motion."[4] The non-moving party is entitled to have "all reasonable inferences of fact drawn in its favor."[5]

#### B. The Trial Court Erred in Granting Summary Judgment Because There Were Genuine Issues of Material Fact.

Alaska Statute 09.55.540 establishes the burden of proof in a medical malpractice action. It requires that the plaintiff establish (1) the standard of care or skill in the act complained of; (2) that the defendant lacked this skill level or failed to exercise this care; and (3) that this failure or lack of skill was the proximate cause of the plaintiff's injuries.[6] Our decision in Kendall v. State, Division of Corrections [7] held that expert testimony is needed to establish a medical malpractice claim:

> In medical malpractice actions ... the jury ordinarily may find a breach of professional duty only on the basis of expert testimony. The primary limitation to this rule is that expert testimony is not needed in non-technical situations where negligence is evident to lay people.[8]

The trial court granted summary judgment against the Trombleys because there was a "lack of expert testimony in [their] case as to the crucial elements of a medical malpractice

**2.** See Christensen v. NCH Corp., 956 P.2d 468, 474 (Alaska 1998).

**3.** Karen L. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 953 P.2d 871, 873 (Alaska 1998) (quoting Newton v. Magill, 872 P.2d 1213, 1215 (Alaska 1994) (internal quotations omitted)).

**4.** Husky Oil N.P.R. Operations, Inc. v. Sea Airmotive, Inc., 724 P.2d 531, 533 (Alaska 1986) (citation omitted).

**5.** Karen L., 953 P.2d at 873.

**6.** See AS 09.55.540(a).

**7.** 692 P.2d 953 (Alaska 1984).

**8.** Id. at 955 (internal quotations and citation omitted) (alteration in original).

claim." Trombley argues that this ruling was erroneous because her experts' testimony established the necessary elements for her allegations (1) that the arterial bypass operation was negligently performed and (2) that the post-operative care of the donor site on her leg was negligent. We agree with Trombley and reverse summary judgment for each of the doctors.

1. *There are triable issues of fact as to Dr. Ahmad's conduct.*

■ In order to defeat summary judgment, Trombley must establish that there are material questions of fact as to whether a mistake was made, negligently causing injuries.

There is expert testimony that a mistake was made by Dr. Ahmad in bypassing the ramus intermedius. Drs. Peter Anastassiou and David Kurzrock testified that the second diagonal had been bypassed instead of the first. They reached these conclusions based on the "tenting" of the artery and because they had accounted for all of the grafts. Dr. Richard Anschuetz also suggested that the wrong vessel may have been bypassed.

Dr. Ahmad argues that there is no expert testimony establishing that, assuming such a mistake was made, it would have been negligent. However, Dr. Ahmad's own testimony establishes this point. At Dr. Ahmad's deposition, the following colloquies occurred:

Q: And you weren't about to admit that you goofed, are you?

A: I did not goof. I'm a very experienced surgeon. I do the right thing when I put something on the chart. I bypassed the ramus intermedius. I know the ramus intermedius as well as he does. And the bypass that he thought I did it, that artery, no surgeon in the world would even have considered that artery to be bypassed because it was a tiny, less than half-a-millimeter artery.

. . . .

A: And if a vessel which is half a millimeter in diameter, if you open that vessel to put a bypass, number one, you would not be able to put a bypass, and secondly, you might even cause some more damage to the heart, and it may end up it bleeding and all kinds of complications. So any surgeon with some experience would not even dare to open up a small vessel which is half a millimeter in diameter.

. . . .

So, it's impossible, it's almost impossible, and this kind of negligence, I can't say it never happens, but if it happens, it's—it's a shame.

. . . .

Q: Now, you say it would have been impossible to bypass the second diagonal?

A: Right.

. . . .

Q: And when you said before it can happen, you didn't mean that?

A: What I meant, that somebody would make a mistake, a gross mistake.

. . . .

Q: And if you did that, it would be a gross mistake, wouldn't it?

A: If I did that, yes.

This testimony shows that if Dr. Ahmad had bypassed the wrong artery, it would have been a negligent act. The combination of Trombley's medical experts' testimony that the wrong artery was bypassed with Dr. Ahmad's testimony that such a mistake would be negligent establishes a triable issue of fact as to whether Dr. Ahmad made a negligent mistake.

Expert testimony also establishes a question of fact as to whether bypassing the wrong artery, if it occurred, was a proximate cause of Trombley's damages. Dr. Colman Ryan observed that Trombley would not have had her post-surgical symptoms and ischemia if the diagonal had been properly bypassed. Dr. Anastassiou observed that, as a result of the improper bypass, additional invasive procedures, such as the angioplasties, were needed to improve the patient's condition. He concluded that the failure to bypass the ramus intermedius resulted "in recurrence of anginal symptoms in this patient."

Because there was sufficient evidence to create genuine issues of material fact as to mistake, negligence, and causation with respect to Dr. Ahmad's conduct, summary judgment was incorrectly granted in his favor.

### 2. There are triable issues of fact with respect to Dr. Barmada's conduct.

■ During the surgery, Dr. Barmada had the role of first assistant to Dr. Ahmad. In that role, he was said to have stood approximately "one inch" from Dr. Ahmad and helped Dr. Ahmad with every step of the bypass process. He held open the arteries while Dr. Ahmad stitched the vein into place. Dr. Barmada testified that "there is no difference between [myself and Dr. Ahmad]. We just—basically these jobs, we swapped around, you know, because we were all so very capable of doing these things."

The standard of care for a first assistant surgeon must be determined on the facts of each individual case.[9] In this case, not only was Dr. Barmada an integral part of the surgical team and a full participant in the bypass procedure, but he also possessed the same level of skill and training as the lead surgeon, Dr. Ahmad. As a cardiac surgeon, Dr. Barmada was fully qualified to perform the bypass surgery. This fact, combined with his vital role on the surgical team, subjects him to the same standard of care as Dr. Ahmad.

The issue of the standard of care for an assistant surgeon under similar circumstances was addressed in *Malbrough v. Hamsa*.[10] In that case, Dr. Hamsa, an assistant surgeon, claimed that he was not liable for complications that developed during a laminectomy because he was an orthopedic surgeon rather than a neurosurgeon and because he did not actually perform the sur-

gery.[11] Arguing that the plaintiff had failed to establish the duties or degree of care required of an orthopedic surgeon who serves as a surgical assistant, Dr. Hamsa appealed the trial court's finding of liability.[12] But based on Dr. Hamsa's direct involvement with the surgical procedure, during which he helped to surgically scrape the disc, and testimony that the techniques used by neurosurgeons and orthopedic surgeons in performing this particular surgical procedure are "no different insofar as their specialities are concerned,"[13] the appellate court concluded that "the standard of care for Dr. Hamsa was the same as for [the lead neurosurgeon]."[14]

When Dr. Barmada moved for summary judgment, he argued in a conclusory fashion that no evidence connected him with anything that went wrong and that plaintiff's expert only implicated Dr. Ahmad. In opposition, Trombley quoted the Barmada deposition passages that say that there is no difference between Dr. Barmada and Dr. Ahmad. Trombley also quoted the expert's report that implicated "Dr. Ahmad and his associates." In reply, Dr. Barmada did not (a) explain his deposition testimony that permitted an inference that he and Dr. Ahmad shared responsibility for the cardiac aspects of the surgery, (b) distinguish his duties from those of Dr. Ahmad, or (c) assert any facts permitting an inference that there had been a discrete division of responsibility between Drs. Ahmad and Barmada as to any aspect of the surgery.

In light of Dr. Barmada's description of his responsibilities as first assistant, his proximity to and ability to observe Dr. Ahmad during the surgery, and his level of training and expertise as a cardiac surgeon, any failure on Dr. Barmada's part to inform Dr. Ahmad that the wrong vessel was being bypassed

---

**9.** See *Kelly v. Riverside Med. Ctr.*, 499 So.2d 1135, 1137 (La.App.1986) (concluding that the liability of an assistant surgeon is to be decided on the facts of each particular case).

**10.** 463 So.2d 639, 646–47 (La.App.1985); *see also Jines v. Abarbanel*, 77 Cal.App.3d 702, 711, 143 Cal.Rptr. 818 (Cal.App.1978) (applying the same standard of care to the chief surgeon and his assistant where the doctors described themselves as a "team who had worked together in

the past" and discussed what was best for the patient).

**11.** *Malbrough*, 463 So.2d at 646–47.

**12.** *Id.* at 646.

**13.** *Id.*

**14.** *Id.* at 647.

could be found negligent. Therefore, it was inappropriate to grant summary judgment in favor of Dr. Barmada.

### 3. *There is a triable issue of fact as to Dr. Randecker's conduct.*

■ Dr. Randecker's role during the surgery was to harvest the vein from Trombley's leg. After the surgery, he was in charge of post-operative care of Trombley. The testimony presents a material question of fact as to whether Dr. Randecker's treatment of Trombley's leg was negligent.

Soon after the surgery, Trombley's leg became infected, according to Drs. Starr and Anschuetz and the physical therapist. Dr. Randecker did not notice the infection, despite Trombley's complaints that her leg hurt and the redness and seeping of the wound. When Trombley returned to the hospital because her leg was smelling and seeping, Dr. Randecker told her that it would heal and prescribed no treatment. Trombley consulted Dr. Anschuetz, who prescribed whirlpool treatments and trimming to remove the dead tissue from the infected leg. Trombley followed this course of treatment. Eventually plastic surgery was performed on the wound.

Dr. Anastassiou testified that Dr. Randecker's care was "a breach in the postoperative care on this patient," relating to "the discovery and management of the wound infection." Mary Williams, the Providence Hospital nurse who did the trimming, told Trombley that she had "never seen such a mess come out of a simple cut on the leg."

The testimony of Dr. Anastassiou suffices to establish a negligent breach of duty. It and Williams's statement imply that the breach caused, at least, damage associated with delay in the healing of the wound.

### C. *The Trial Court Properly Dismissed Dale Trombley's Loss of Consortium Claim.*

■ At the time of her surgery on October 8, 1991, Barbara Trombley was married to Keith Bradrick. Bradrick was a long-time sufferer from Alzheimer's disease and was living in a critical care facility. Dale Trombley, who was recently widowed after forty-five years of marriage, and Barbara met in 1990 and eventually became romantically involved. They began cohabiting in September of 1991. Meanwhile, Barbara continued to visit Bradrick and at some level personally provided care for him.[15] Barbara divorced Bradrick in early May of 1992 and married Dale a few days later.

Dale claims that his premarital relationship with Barbara is entitled to protection in the law of torts. Specifically, he claims that he was a "de facto" spouse at the time of the alleged malpractice and as such is entitled to loss of consortium damages.

■ Dale's claim is almost completely unsupported by precedent. There are two related rules that bar his claim. The first is that when a person is injured and then marries, the new spouse has no consortium claim. "[A]n injury occurring prior to the marital relationship cannot give rise to a claim for loss of consortium."[16] "Where the injured person received his or her injury prior to marriage, the other spouse upon marriage has no cause of action for loss of consortium of his or her previously injured marriage partner, even though they were engaged to be married at the time of the injury."[17] Second, unmarried cohabitants do not have consortium claims for their partners' injuries which occur during cohabitation.[18] Dale takes issue with this, the second rule.

*Butcher v. Superior Court*[19] is the case upon which Dale places primary reliance. In

---

**15.** She stated that when she first placed him in the care facility in June of 1990 she "fed him, dressed him, bathed him, changed diapers, stayed up all night at times, and did all the things [she] could to enable him to have as good a life as possible under the circumstances."

**16.** *Angelet v. Shivar,* 602 S.W.2d 185, 185 (Ky. App.1980) (citations omitted).

**17.** *Sawyer v. Bailey,* 413 A.2d 165, 166 (Me. 1980).

**18.** *See Elden v. Sheldon,* 46 Cal.3d 267, 250 Cal. Rptr. 254, 758 P.2d 582, 588 (1988).

**19.** 139 Cal.App.3d 58, 188 Cal.Rptr. 503 (1983).

that case, an intermediate appellate court in California held that "an unmarried cohabitant may state a cause of action for loss of consortium by showing that the nonmarital relationship is both stable and significant."[20] But *Butcher* was disapproved of by the Supreme Court of California in *Elden v. Sheldon,*[21] and it seems that no jurisdiction now holds that unmarried cohabitants are entitled to maintain loss of consortium claims.

In declining to expand consortium claims to unmarried cohabitants, the court in *Elden* noted that the courts have adhered to a bright line in this area because of "the intangible nature of the loss, the difficulty of measuring damages, and the possibility of an unreasonable increase in the number of persons who would be entitled to sue for the loss of a loved one."[22] The court also relied on "the state's interest in promoting the responsibilities of marriage and the difficulty of assessing the emotional, sexual and financial relationship of cohabiting parties to determine whether their arrangement was the equivalent of a marriage...."[23]

Justice Broussard filed a strong dissent in *Elden.*[24] Briefly, his reasons, and the reasons given by the court in *Butcher,* are as follows: First, the common law is an "ever-changing malleable body of law distinguished by its ability to adapt to changing times and issues."[25] Second, the "relationship of unmarried cohabitants bears every resemblance to the spousal relationship, including the sexual aspect absent from other relationships, except that the relationship has not been solemnized by a formal marriage ceremony."[26] Third, the significant numbers of unmarried cohabitants in society make such a relationship reasonably foreseeable to the tortfeasor.[27] Fourth, the

[l]egislature has granted unmarried cohabitants the equivalent legal rights provided marital couples in the fields of housing, credit and family relations. Depriving unmarried persons of compensation for injuries in tort no more advances the state's interest in marriage than would restrictions on their acquisition of housing or credit. The trend ... is toward *removing* legal distinctions based on marital status that serve only to burden the unmarried without advancing some corresponding societal interest.[28]

Whether spousal consortium claims should be extended to unmarried cohabitants as a general matter is not an easy issue to resolve. There are reasonable arguments on both sides. But we need not resolve that issue here, for in this case one of the cohabitants was married. Here, if we were to accept appellants' argument, there would be a real possibility that two spouses, one legal, the other de facto, would have valid consortium claims. In this circumstance we believe that the reasons not to recognize consortium claims of unmarried cohabitants expressed by the majority in *Elden* are magnified and clearly counsel against departure from the rule that legal marriage is a requirement for spousal consortium claims.

For these reasons we conclude that the superior court did not err in granting summary judgment in favor of appellees with respect to Dale Trombley's loss of consortium claim.

### D. · *We Do Not Resolve the Sweet Issue.*

Relying on our decision in *Sweet v. Sisters of Providence in Washington,*[29] Trombley

---

20. *Id.* at 512.

21. 46 Cal.3d 267, 250 Cal.Rptr. 254, 758 P.2d 582, 590 (1988).

22. *Id.* at 589.

23. *Id.* at 589–90.

24. *Id.* at 590–95 (Broussard, J., dissenting).

25. *Butcher,* 188 Cal.Rptr. at 507; *see also Elden,* 250 Cal.Rptr. 254, 758 P.2d at 594 (Broussard, J., dissenting) (arguing that lack of precedent

does not justify refusal to extend loss of consortium claims to unmarried cohabitants).

26. *Butcher,* 188 Cal.Rptr. at 508.

27. *See id.* at 510; *see also Elden,* 250 Cal.Rptr. 254, 758 P.2d at 591 (Broussard, J., dissenting).

28. *Elden,* 250 Cal.Rptr. 254, 758 P.2d at 592 (Broussard, J., dissenting) (footnote omitted) (emphasis added).

29. 895 P.2d 484, 491–92 (Alaska 1995).

claims that the trial court erred because it failed to address whether the operative notes were so inadequate as to hinder her ability to prove her case. The defendants argue that Trombley did not raise this claim until her motion for reconsideration.

Because we are remanding this case for a new trial on the merits, we do not resolve the question of whether the request for a *Sweet* determination was untimely. On remand, based on a timely request, the findings required by *Sweet* can be made.

E. *The Trial Court Erred in Granting Summary Judgment on the Informed Consent Issue.*

■ Trombley's informed consent claim is based on the doctors' decision to harvest a vein from her right leg rather than her left. Trombley told her doctors that she did not want a vein harvested from her right leg because of her history of phlebitis. The doctors agreed to harvest a vein from her left leg. At no time did the doctors discuss with her the possibility of harvesting a vein from the right leg. Dr. Ahmad explained that he decided to harvest from her right leg despite the history of phlebitis because the operating room was set up for a right leg harvest. Dr. Ahmad acknowledged that Trombley's consent to a right leg harvest should have been obtained. But he also testified that he had not been told of Trombley's wishes concerning harvesting only from the left leg, and there was no chart note to that effect.

■ "The informed consent claim is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body."[30] Trombley thus had a right to insist that her right leg not be used as a harvest site. If her right leg was used in the absence of her actual or implied consent, a battery may have been committed for which she may be entitled to actual, or nominal, damages.[31]

Although Trombley pled a failure to obtain informed consent claim in her second amended complaint and alleged in detail the facts concerning her insistence that the left rather than the right leg be used as the donor site of the vein, the defendants' motions for summary judgment do not separately deal with her informed consent claim. The defendants' primary argument is that Trombley's experts did not establish that the defendants' conduct fell below the applicable standard of care.

A party moving for summary judgment has the burden of making a prima facie showing that there are no genuine issues of material fact.[32] This burden was not met with respect to Trombley's informed consent claim, for the elements of that claim were not even discussed.

The defendants argue that the informed consent argument is waived because Trombley did not mention it in her opposition to the motion for summary judgment, or her motion for reconsideration, or her points on appeal. But our review of the record indicates that Trombley did reiterate the facts of her claim in the verified statement of the facts which she submitted in opposition to the motion for summary judgment. She referred to her "repeated and urgent request" that the vein be taken from her left leg "which was cavalierly ignored by the surgical team consisting of Drs. Ahmad, Barmata [sic] and Randecker." It is true that Trombley did not label the claim to which these facts applied as a failure to obtain her consent. This would have been helpful. But she was not obligated to do so, for the defendants had not made the required prima facie showing negating the existence of her claim.[33] Thus, the burden to demonstrate the existence of facts requiring a trial was not shifted to Trombley.

One of Trombley's points on appeal was that the court erred in granting summary judgment in favor of the defendants. This is

---

**30.** *Korman v. Mallin,* 858 P.2d 1145, 1149 (Alaska 1993) (quoting *Hondroulis v. Schuhmacher,* 553 So.2d 398 (La.1989)).

**31.** *See* Restatement (Second) of Torts §§ 18–20 (1965); W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 9, at 39 (5th ed.1984).

**32.** *See French v. Jadon,* 911 P.2d 20, 23 (Alaska 1996).

**33.** *See id.*

broad enough to encompass the summary judgment on her informed consent claim. Further, it is no longer true that points not listed in a statement of points on appeal will not be considered on appeal. Instead, the rule is that failure to state points in the statement of points is not in itself a waiver so long as the point is adequately briefed and the court can address it "effectively without reviewing untranscribed portions of the electronic record."[34] These conditions are met in this case. For these reasons the informed consent claim has not been waived.

The defendants also claim that the informed consent claim is legally insufficient. But this argument was not made below, is not well developed on appeal, and is in part fact dependent, and the facts on which it depends are not well focused. Under these circumstances, we decline to consider this argument.

F. *The Trial Court Should Correct the Judgment Regarding Dale Trombley's Attorney's Fees.*

Dale Trombley initially argued that the attorney's fees award against him should be reduced, but the defendants point out that they had already stipulated to such a reduction, and the trial court amended the award in accordance with the stipulation. Evidently, an amended judgment reflecting this reduced amount has not been entered. The trial court should enter such a judgment on remand.

## IV. CONCLUSION

For the foregoing reasons, the trial court's grant of summary judgment is REVERSED and REMANDED except with respect to the loss of consortium claim. The trial court should enter an amended judgment with respect to the attorney's fees against Dale Trombley.